1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DISABILITY RIGHTS ADVOCATES
SID WOLINSKY (SBN 33716)
swolinsky@dralegal.org
MARY-LEE SMITH (SBN 239086)
msmith@dralegal.org
KARLA GILBRIDE (SBN 264118)
kgilbride@dralegal.org
2001 Center Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 665-8644
Fax: (510) 665-8511; TTY: (510) 665-8716

DISABILITY RIGHTS LEGAL CENTER
PAULA PEARLMAN (SBN 109038)
Paula.pearlman@lls.edu
SHAWNA L. PARKS (SBN 208301)
Shawna.parks@lls.edu
919 Albany Street
Los Angeles, CA 90015
Telephone: (213) 736-1031
Fax: (213) 736-1428; TTY: (213) 736-8310
*Attorneys for Plaintiffs*

(left margin, vertical) DISABILITY RIGHTS ADVOCATES 2001 CENTER STREET, FOURTH FLOOR BERKELEY, CALIFORNIA 94704-1204

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMUNITIES ACTIVELY LIVING INDEPENDENT AND FREE, a nonprofit corporation, and AUDREY HARTHORN, an individual, on behalf of themselves and ALL OTHERS SIMILARLY SITUATED,<br><br>     Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a public entity, and COUNTY OF LOS ANGELES, a public entity,<br>     Defendants. | **Case No.: CV 09-0287 CBM (RZx)**<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: August 30, 2010<br>Time: 11 a.m.<br>Courtroom: 2<br><br>Action Filed: January 14, 2009<br>Judge: Hon. Consuelo B. Marshall |

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on August 30, 2010, at 11a.m., or at such other date and time as may be ordered by the Court, in Courtroom 2 of the above-captioned Court, located at 312 North Spring Street, Los Angeles, California 90012 Plaintiffs will and hereby do move this Court for an order for summary judgment pursuant to Federal Rule of Civil Procedure 56. As set forth more fully herein, there is no genuine issue as to material facts relating to the City of Los Angeles' failure to provide meaningful access to its emergency preparedness program and, as such, Plaintiffs are entitled to judgment as a matter of law.

This motion is based upon this Notice; the accompanying Memorandum of Points and Authorities; declarations of Mary-Lee Smith, June Kailes, Michael Collins, Audrey Harthorn, Lilibeth Navarro, Norma Jean Vescovo and Shannon Murray, and all supporting exhibits; all pleadings and papers on file in this action; and any argument or evidence that may be presented at the hearing in this matter, if a hearing is deemed necessary.

This motion is made following the conference of Counsel pursuant to Local Rule 7-3 which took place on July 23, 2010.

DATED: August 2, 2010                    Respectfully submitted,

                                         DISABILITY RIGHTS ADVOCATES
                                         DISABILITY RIGHTS LEGAL CENTER


                                         _____
                                         Attorneys for Plaintiffs

**RELIEF SOUGHT**

Plaintiffs ask the Court to enter summary judgment on each of Plaintiffs' causes of action pled in their Complaint with regard to liability, and to declare that the City of Los

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

*CALIF., et al., v. City and County of Los Angeles*, Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1

1  Angeles is in violation of the Americans with Disabilities Act, 42 U.S.C. §§12101 *et seq*;

2  Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq*; the California Disabled

3  Persons Act, California Civil Code §§ 54 *et seq*.; and California Government Code §§

4  11135 *et seq*.  Plaintiffs request a court order that the parties meet and confer with the

5  assistance of a magistrate judge in order to craft an appropriate remedy.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204

## TABLE OF CONTENTS

I.    Introduction..........................................................................................1

II.   Statement of Facts.................................................................................2

    A.   The Essential Components of an Emergency Preparedness Program Are Well-Established. ..........................................................................2

    B.   The City Provides an Emergency Preparedness Program for Its Residents But It Fails to Address the Needs of Persons with Disabilities. ...........3

        1.   The City Provides Mass Shelter and Care Which Is Inaccessible To Persons with Disabilities...........................................................4

        2.   In Creating Its Emergency Plans, the City Has Failed to Include Input From the Disability Community. ..................................................7

            a.   The City Includes Input from Community Groups But Not From the Disability Community....................................7

            b.   The City's Purported Reliance on the City's Department on Disability for Emergency Planning Is Wholly Inadequate.8

            c.   The City's Emergency Plans Must Specifically Address the Needs of Persons with Disabilities. ...................................9

        3.   The City Regularly Assesses the Efficacy of Its Plans But Does Not Assess Their Effectiveness for Persons with Disabilities.........10

        4.   Although the City Identifies In Advance the Needs of and Resources for Its Residents During an Emergency, It Fails To Do So for Persons with Disabilities. ...................................................................10

        5.   The City Has Plans to Notify Its Residents of an Emergency But Has Failed to Plan for Notifying Persons With Disabilities. ...........12

        6.   Although the City Expects Residents to Shelter In Place, It Provides No Assistance to Persons with Disabilities To Do So..............13

        7.   In Providing Evacuation and Transportation to Shelters, the City Does Not Address the Needs of Persons with Disabilities. ...............13

        8.   The City's Mass Evacuation Plans Include No Provisions to Meet the Needs of Persons with Disabilities. ...........................................15

        9.   The City Has No Plans for Accessible Temporary Housing. ....15

        10.  The City's Recovery Plan Fails to Provide Any Assistance to Persons with Disabilities After an Emergency......................................15

    C.   The Plaintiffs and City Are Covered Under Plaintiffs' Legal Claims.16

III. Legal Standard ................................................................................16

IV. Statement of the Law .........................................................................17

    A.    There Is No Genuine Issue of Material Fact As To Each Element of Plaintiffs' ADA and Section 504 Claims. ...........................................17

        1.    The City Discriminates Against Persons with Disabilities By Failing to Provide Meaningful Access to Its Emergency Preparedness Program. ....................................................................................17

            a.    The City Denies Meaningful Access Because Its Emergency Preparedness Program Disproportionately Burdens Persons with Disabilities Due to Their Unique Needs. ...............18

            b.    The City Denies Meaningful Access By Failing to Provide Reasonable Accommodations for Its Emergency Preparedness Program........................................................20

        2.    Plaintiffs Have Satisfied the Other Elements Under the ADA and Section 504............................................................................23

    B.    There Is No Genuine Issue of Material Fact As To Plaintiffs' Claims Under California Law.................................................................................23

        1.    The City Violates the Disabled Persons Act By Failing to Provide Full and Equal Access to Its Emergency Preparedness Program.....23

        2.    The City Violates California Government Code Section 11135 By Failing to Provide Full and Equal Access to Its Emergency Preparedness Program.................................................................24

    C.    The Court Need Not Determine The Remedy At This Stage. ............25

V. Conclusion .......................................................................................25

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

*CALIF, et al., v. City and County of Los Angeles*, Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

ii

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Choate,*
469 U.S. 287 (1985) ............................................................................................. 18, 21

*Armstrong v. Davis,*
275 F.3d 849 (9th Cir. 2001) ............................................................................... 17

*Celano v. Marriott Intern., Inc.,*
2008 U.S. Dist. LEXIS 6172 (N.D.Cal. 2008) ................................................... 25

*Crowder v. Kitagawa,*
81 F.3d 1480 (9th Cir. 1996) ............................................................................... 18, 21

*D.K. ex rel. G.M. v. Solano County Office of Educ.,*
667 F.Supp.2d 1184 (E.D.Cal. 2009) ................................................................. 24

*Dare v. California,*
191 F.3d 1167 (9th Cir. 1999) ............................................................................. 18

*Dunlap v. Ass'n of Bay Area Gov'ts,*
996 F.Supp. 962 (N.D.Cal. 1998) ....................................................................... 21

*Fontenot v. Upjohn Co.,*
780 F.2d 1190 (5th Cir. 1986) ............................................................................. 17

*Fortyune v. Am. Multi-Cinema, Inc.,*
2002 U.S. Dist. LEXIS 27960 (C.D. Cal. 2002) ................................................ 25

*Grace Church v. City of San Diego,*
555 F. Supp. 2d 1126 (S.D. Cal. 2008) ............................................................... 25

*Hankins v. El Torito Restaurants, Inc.,*
63 Cal.App.4th 510 (1998) ................................................................................... 24

*Henrietta D. v. Bloomberg,*
331 F.3d 261 (2d Cir. 2003) *cert. denied,* 541 U.S. 936 (2004) ........................ 17, 21

*Henrietta D. v. Giuliani,*
246 F.3d 176 (2d Cir. 2001) ................................................................................ 25

*Hubbard v. SoBreck,*
554 F.3d 742 (9th Cir. 2009) ............................................................................... 24

*Lovell v. Chandler,*
303 F.3d 1039 (9th Cir. 2002) ............................................................................. 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ............................................................................................. 17

*McGary v. City of Portland,*
386 F.3d 1259 (9th Cir. 2004) ............................................................................. 17, 21, 22

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

*Milliken v. Bradley,*
    433 U.S. 267 (1977) ..................................................................25

*Olmstead v. Zimring,*
    527 U.S. 581 (1999) ..................................................................22

*Presta v. Peninsula Corridor Joint Powers Bd.,*
    16 F.Supp. 2d 1134 (N.D.Cal. 1998).........................................21

*Rodde v. Bonta,*
    357 F.3d 988 (9th Cir. 2004)...............................................17, 18

*Vinson v. Thomas,*
    288 F.3d 1145 (9th Cir. 2002) ...................................................17

*Weinreich v. Los Angeles County Metropolitan Transp. Authority,*
    114 F.3d 976 (9th Cir. 1997).....................................................17

*Williams v. Grannis,*
    2010 WL 1405488 (E.D.Cal. 2010) .........................................24

*Wong v. Regents of Univ. of Cal.,*
    192 F.3d 807 (9th Cir. 1999).....................................................20

*Zands v. Nelson,*
    797 F.Supp. 805 (S.D.Cal. 1992) ..............................................16

*Zukle v. Regents of University of California,*
    166 F.3d 1041 (9th Cir. 1999)...................................................17

**Federal Regulations**

28 Code of Federal Regulation § 35.130(b)(7).................................................20

**Federal Rules**

Federal Rule of Civil Procedure, 56(c) ...........................................................16

Federal Rule of Civil Procedure, 56(e)(2) ......................................................17

**State Statutes**

California Civil Code § 54.1(a)(1)...................................................................24

California Civil Code § 54(c) ..........................................................................23

California Government Code § 11135(a) ..........................................................24

California Government Code § 11135(b) ..........................................................25

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

*CALIF, et al., v. City and County of Los Angeles,* Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

*Q: Do you think you are as well prepared to deal with the needs of people with disabilities in an emergency as you are with the general population?*

*A: No. (James Featherstone, General Manager of the City of Los Angeles' Emergency Management Department).*

## I.   INTRODUCTION

The City of Los Angeles has a comprehensive emergency preparedness program for all of its residents.  It is undisputed, however, that the City's program is woefully deficient in addressing the needs of persons with disabilities.  In a scathing critique of the emergency preparedness program, the City's own Department on Disability concluded:

> Angelinos with disabilities will continue to be at-risk for suffering and death in disproportionate numbers, unless the City family drastically enhances the existing disability-related emergency management and disaster planning process and readiness as required by the ADA and other statutes. [#126]

The City has not heeded this warning.  Remarkably instead, the record includes a series of admissions, from all levels of City bureaucracy, confirming the City's continuing failure to provide meaningful access to persons with disabilities.

Though shelter and care is the centerpiece of its emergency preparedness program, the City has surveyed only 12 to 14 of its approximately 200 shelters for architectural accessibility.  The City has also made no attempt to assure that care offered at the shelters will meet the unique needs of persons with disabilities.

Although the City admits that input from the community is essential for emergency planning, it has utterly failed to include the input of disability community organizations in any aspect of planning for disasters.  In addition, City employees, ranging from top management to first responders, have virtually all admitted that they have never looked at reports or turned to other jurisdictions to learn more about emergency preparedness for persons with disabilities.  Rather, the City's planning has proceeded in isolation and ignorance of what is needed for persons with disabilities.

Now 20 years since the passage of the ADA, the City has yet to conduct any

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

*CALIF, et al., v. City and County of Los Angeles,* Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1

assessment as to the efficacy of its emergency plans in serving persons with disabilities. The City has also failed entirely to identify the needs of persons with disabilities and to determine whether the City has the capacity to meet those needs.

The City acknowledges that it must provide an emergency notification system accessible to disabled persons yet admits there are no protocols for notifying persons with disabilities in an emergency. Nor does the City have protocols for extricating persons with disabilities from their homes or for providing accessible transportation to shelters.

In addition, the City has made no provisions whatsoever in its emergency plans to support persons who must shelter in place for the first 72 hours after a disaster, to include persons with disabilities in a mass evacuation, to provide accessible temporary housing or to repair accessibility features (e.g., ramps) in the recovery phase of an emergency.

The City admits that persons with disabilities are more vulnerable than others during emergencies. Yet by choosing to provide an emergency preparedness program that does not address their unique needs, the City is denying meaningful access to its program for persons with disabilities. Moreover, in many instances, it is not enough that the City provides the emergency preparedness program equally to all. In the disability context, equal treatment does not always beget equality. In order to provide meaningful access, the City may need to take affirmative steps to address the needs of persons with disabilities; indeed, the City admits that such persons may need reasonable accommodations. Yet by failing to make reasonable accommodations, the City is further denying meaningful access to its emergency preparedness program.

Plaintiffs are entitled to summary judgment because, based on the City's own documents and the multiple admissions of its employees, there is no genuine issue of material fact as to Plaintiffs' claims.

## II.   STATEMENT OF FACTS

### A.   The Essential Components of an Emergency Preparedness Program Are Well-Established.

An "emergency preparedness program" consists of the preparations necessary to

*CALIF, et al., v. City and County of Los Angeles,* Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

2

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

respond to an emergency and to mitigate the effects of an emergency. The City admits that these preparations must include, at the very minimum, certain essential components:

1. Provide shelter and care for persons forced to evacuate their homes [#1];

2. Create emergency plans (which includes involving community groups in the development of such plans and putting detailed plans in writing) [#2-6];

3. Assess the efficacy of emergency plans [#7-8];

4. Identify both needs and resources in advance of an emergency [#9];

5. Notify residents that an emergency is imminent or in progress [#10-12];

6. Determine if individuals should shelter in place (e.g., for an initial period after an emergency or when it is not appropriate to evacuate their homes) [#13-14];

7. Assist individuals to evacuate their homes and travel to shelters or gathering points for further evacuation [#15];

8. Organize mass evacuation from the entire area of a disaster [#16-17];

9. Provide temporary housing for those who cannot immediately return home once shelters close [#18];

10. Assist in recovery and remediation efforts after the emergency [#19].

**B.    The City Provides an Emergency Preparedness Program for Its Residents But It Fails to Address the Needs of Persons with Disabilities.**

The City unequivocally admits that its emergency preparedness program does not adequately serve the unique needs of persons with disabilities. [#20-23] Indeed, the General Manager of the Emergency Management Department ("EMD") – charged with developing and managing the City's emergency program – admits that the City is not "as well prepared to deal with the needs of people with disabilities as [it is] to deal with the needs of the general population." [#20] Keith Garcia, Emergency Preparedness Director and the "direct liaison" between the EMD and the City's Department on Disability ("DoD"), also admits that "the City does not do as good a job in its emergency planning for people with disabilities as it does for the general population" [#21-22] and that "more could be done in emergency preparedness for people with disabilities." [#23]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204

The City is aware that approximately 21% of its residents [#24], or more than 800,000 residents [#25], have disabilities. The City admits that emergencies may have a greater impact on persons with disabilities [#26] and, thus, it is essential to include them in emergency plans. [#27] The City also admits that persons with disabilities have unique needs during an emergency. [#28] It further admits that persons with disabilities may need reasonable accommodations during emergencies. [#29] Despite all of this, the City admits that nothing has changed for disabled persons with regard to the City's emergency preparedness program since filing this lawsuit in January of 2009. [#30][1]

The neglect of persons with disabilities is especially dangerous because the City is extremely susceptible to disaster. [#32-33] The City admits that it is the entity most immediately responsible for aiding its citizens in an emergency; the City is at the first level of response. [#34] Accordingly, the City's emergency preparedness program is extensive, complete with a 200 plus page Master Plan [#35-36], twenty-one "annexes" (addressing various types of disasters) [#37-38], an Emergency Operations Board with fifteen departmental representatives [#39] and an Emergency Management Committee. [#40] This comprehensive program addresses all of the essential components described above. For each of these components, though, the City fails to provide for the unique needs of persons with disabilities or to make reasonable accommodations.

       **1.    The City Provides Mass Shelter and Care Which Is Inaccessible To Persons with Disabilities.**

The City admits that it has a plan for mass shelter and care for residents. [#41-42] It is undisputed that the City's own Department of Recreation and Parks is responsible for "ensuring that the City has a shelter and welfare plan to support the immediate evacuation needs of the victims." [#43] The City has identified some 200 shelter sites, all under the jurisdiction of the City's Recreation and Parks Department. [#44]

Experts agree and the City does not dispute that shelters must be accessible, both

---

[1] Two EMD employees report a new requirement to take an online FEMA course addressing persons with disabilities in emergencies after the filing of this lawsuit. [#31]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204

1   architecturally and with respect to the care that they offer. [#45-46]  The City admits, for

2   instance, that in providing architectural accessibility, a difference in half an inch can

3   make a facility inaccessible to persons with mobility disabilities. [#47]  The City also

4   admits that in providing care at shelters, persons with disabilities may require special

5   accommodations. [#48]

6          However, the City has no idea which, if any, of its 200 shelter sites are accessible,

7   either architecturally or as to the care offered.  Thus, in an emergency, persons with

8   disabilities do not know which shelters are accessible. [#49]

9          The City's attempts at ensuring architectural accessibility are woefully inadequate.

10  This March, the City first began surveying its 200 shelter sites for ADA compliance.

11  [#50]  The initial surveys were admitted to be "quick checks," [#51] which cannot

12  determine whether a shelter is fully accessible. [#52-53]  The City admits that a facility

13  passing a "quick check" may not actually be accessible. [#54]  The City finally has now

14  started "full" surveys but it has surveyed only 12 to 14 of its 200 shelter sites [#55] at a

15  leisurely pace of 2 shelters "once or twice a month." [#56]  These surveys have found

16  that *all* the 12 to 14 shelters have "problems with the ADA." [#57]  In addition, the City

17  has chosen to rely on City employees who are inexperienced in conducting such surveys

18  [#58] and has not consulted any outside experts. [#59]  As a result, the surveys are not

19  being conducted correctly.[2]

20         Further, the City admits that no effort whatsoever has been made to ensure that the

21  care offered at its shelters is accessible. [#66]  For instance, the City's survey does not

22  evaluate what medical supplies may be needed for persons with disabilities at shelters,

23  such as medications (e.g., insulin), durable medical equipment (e.g., wheelchairs) and

24  respirators [#67].  It also does not determine whether there are refrigeration capabilities

25  for medication [#68] and does not consider the needs of service animals at shelters. [#69]

26

27  [2] For example, ramps that exceed a certain slope are inaccessible to persons with mobility
    disabilities. [#60]  Yet, the city employees are not using any tool to measure such slopes at the
    shelters [#61] but instead they are "eyeballing" the slopes. [#62]  The City thus admits that it

28  does not know whether the ramps at any shelter sites are ADA compliant. [#63-65].

---

*CALIF, et al., v. City and County of Los Angeles*, Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF                                                                              5

1   The City also admits that it does not have policies to ensure that persons with disabilities
2   will remain with their families in shelters. [#70]

3        Faced with these remarkable deficiencies in shelters, the City plays the "blame
4   game." Starting with its unsuccessful motion to dismiss this case, the City has argued
5   that the Red Cross is the entity responsible for shelter management. [#71]  City
6   employees testified that responsibility for shelter access lies with the Red Cross. [#72]
7   The City claims that the Red Cross will take care of the needs of persons with disabilities
8   by supplying medications and any equipment needed by persons with disabilities [#73-
9   74], providing back up power (e.g., for charging a power wheelchair) [#75], meeting any
10  special dietary needs for persons with disabilities, [#76] and ensuring that caregivers are
11  able to remain with disabled persons in shelters. [#77]  Yet the City admits that it has no
12  plan to supervise, inspect or evaluate the Red Cross's work. [#78]

13       However, the Red Cross has unequivocally stated that it is not responsible for
14  shelter accessibility.  Michael Kleiner, Director of Emergency and Disaster Response for
15  the American Red Cross of Greater Los Angeles, testified that the Red Cross is not
16  responsible for shelter compliance with the ADA [#79] or the accessibility of shelters
17  selected [#80] and has not evaluated shelter sites for accessibility. [#81]  The Red Cross
18  is also not responsible for medical supplies, [#82] insulin, [#83] backup generators, [#84]
19  or accessible cots [#85] at any shelters; or for accommodating any special dietary needs
20  of persons with disabilities [#86]; or for what will happen to service animals in a shelter
21  (e.g. feeding and toileting). [87]

22       Indeed, the Red Cross has no agreement with the City setting forth any obligations
23  of the Red Cross in an emergency. [#88]  Moreover, there is no agreement between the
24  City and the Red Cross in which the Red Cross has committed itself to do anything
25  specific with respect to people with disabilities. [#89][3]  Even though the City tries to

26

27  [3] The City and the Red Cross have been "working on" a memorandum of understanding since at
    least 2008. [#90] It has never been executed. [#91]  Further, the MOU does not assign any
28  duties with regard to providing accessible shelters.  It only states "[t]he City and Red Cross will

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204

1   place the responsibility for accessible shelters on the Red Cross, the City admits that even

2   an MOU with the Red Cross would not ensure accessibility. [#93]

### 2. In Creating Its Emergency Plans, the City Has Failed to Include Input From the Disability Community.

#### a. *The City Includes Input from Community Groups But Not From the Disability Community.*

6   The City admits that it includes the input of a wide variety of community groups in

7   its emergency planning "because community groups have an important contribution to

8   make in terms of emergency planning." [#94]  Indeed the City created the Emergency

9   Network of Los Angeles (ENLA), the mission of which is to enhance preparedness and

10  coordinate response to disasters through linkages among the private sector and the City.

11  [#95]  ENLA represents the diverse interests of thirty non-profit organizations. [#96]

12  Experts agree and the City admits that input into planning from the disability

13  community – whether from community organizations, reports or the experience of other

14  jurisdictions – is critical. [#97-100]  Inclusion not only ensures that the disability

15  community has an equal role in planning to that of other community groups; it also

16  facilitates access for persons with disabilities to all other essential components of

17  emergency preparedness. [#101-102]

18  Despite the critical importance of disability community input, the City has utterly

19  failed to include such input when creating its emergency plans.  The City's top officials

20  and other staff repeatedly admit that they have had no contact with disability

21  organizations. [#103]  Mr. Garcia, the EMD coordinator focusing on community outreach

22  [#104], admits that the City "has not sufficiently made ongoing contact with nonprofit

23  community groups that represent people with disabilities with respect to emergency

24  planning." [#105]  The City has not consulted any disability community organizations to

25  get input on the City's emergency plans. [#106]  The ENLA does not include even one

26  disability community organization and has no committee that focuses on disability issues.

27

28  mutually ensure to the fullest extent possible that disaster relief operations within the City will
    be equally accessible to persons with disabilities and the elderly." [#92]

*CALIF, et al., v. City and County of Los Angeles*, Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

1  [#107] The City has not even disseminated its emergency plans to disability community
2  organizations. [#108] The City's emergency preparedness program does not have a
3  disability coordinator. [#109]

4      The City has further failed to incorporate any input from other disability
5  perspectives.  City employees repeatedly admit that they have not even looked at the
6  plans of other jurisdictions concerning emergency needs of persons with disabilities.
7  [#110] City employees, including the head of the EMD, have not read reports from any
8  disability organization, national or local, about improving disability emergency planning.
9  [#111]  The one deposed city employee who has read reports about disabled people
10  during emergencies admits that the City has not "adopted any improvements or made any
11  changes in response to those reports." [#112]  Furthermore, the City has not hired any
12  outside expert to analyze its emergency planning for persons with disabilities. [#113]

13          *b.    The City's Purported Reliance on the City's Department on*
                  *Disability for Emergency Planning Is Wholly Inadequate.*

14      The City attempts to excuse its continued exclusion of disability community input
15  by claiming to consult its own employees at the Department on Disability ("DoD").
16  [#114]  Yet the EMD is unaware of what the DoD actually does [#115] or the scope and
17  degree of its expertise. [#116]  The DoD has no full time staff dedicated to emergency
18  planning [#117] and there is no formal structure for coordination or meetings with the
19  DoD. [#118]  There is also no representative from the DoD on the Emergency Operations
20  Board. [#119]  The DoD is not a regular participant in the Emergency Operations Center
21  but is only called in "as needed." [#120]  Furthermore, the EMD is free to reject any or
22  all recommendations of the DoD. [#121]  Indeed Mr. Featherstone, head of the EMD,
23  cannot recall ever adopting any improvement in disaster planning for people with
24  disabilities based on any DoD input. [#122]

25      In fact, the DoD has provided substantial input on which EMD could have acted.
26  In August of 2008, the Department on Disability wrote to Mr. Featherstone, stating:

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

---

*CALIF, et al., v. City and County of Los Angeles,* Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF

8

"[i]t is our belief that the City Emergency Management and Disaster Preparedness Program is **seriously out of compliance with the Americans with Disabilities Act of 1990 (Title II), The Rehabilitation Act of 1973, as amended, Section 504,** and the President's New Freedom Initiative." [#123]

The memorandum adds that "there appears to be continued resistance and a lack of responsiveness" to DoD's recommendations which "are often overlooked and not included in reports unless DoD staff are actually present at meetings and bring attention to the issues." [#124]  In this memorandum, the DoD requested, among other things, that:

- the City survey all shelters, warming centers, cooling centers, relocation sites, evacuation assistance centers, etc, for accessibility pursuant to the DOJ Checklist.
- the City establish a Memorandum of Understanding (MOU) with the Los Angeles Chapter of the American Red Cross (ARC) to address the provision of reasonable accommodation and personal assistants during emergencies.
- the City evaluate all emergency plans to ensure that the needs of people with disabilities have been adequately addressed.
- the City integrate people with disabilities, disability service providers, and advocacy organizations into the planning process. [#125]

The City has not adopted any one of these recommendations. [#127]  Accordingly, the DoD's conclusion that the City's emergency preparedness program does not comply with federal disability laws remains true today.

### c.   The City's Emergency Plans Must Specifically Address the Needs of Persons with Disabilities.

The City further attempts to justify its exclusion of persons with disabilities by suggesting that the ways to address the needs of persons with disabilities are too specific to be in the City's emergency plans. [#128]  According to the City, the specifics of ensuring that men, women and children with disabilities are not injured or killed are merely "tactical" and "operational" and to be delegated to other departments. [#129]  However, there are no documents that explain how those departments would assist persons with disabilities during an emergency. [#130]  On the contrary, the departments

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

1   to which these details have been delegated, namely Police, Fire and Recreation and Parks,

2   admit that they too have no plans for addressing the needs of disabled persons. [#131]

### 3.   The City Regularly Assesses the Efficacy of Its Plans But Does Not Assess Their Effectiveness for Persons with Disabilities.

The City assesses the efficacy of its emergency plans for the general population on an ongoing basis. Indeed whenever the City's emergency operations center is activated, there must be an after-action report. [#132] Also, in the past two years, there has been a systematic review of the City's emergency preparedness program. [#133]

Experts agree and the City does not dispute that assessing the efficacy of a city's emergency plans requires regularly evaluating such plans' effectiveness with regard to people with disabilities. [#134] However, it is undisputed that the City has not assessed the effectiveness of its plans with respect to disabled persons. [#135] There has been no "systematic study of the extent to which the City's emergency plans adequately or do not adequately serve the needs of people with disabilities." [#136] Moreover, there has been no assessment as to whether the Fire Department, Police Department or even the City has the capacity to respond to the emergency needs of persons with disabilities. [#137] The City also admits that there has been no organized investigation of past disasters in the Los Angeles area specifically to see how the City's emergency program worked for disabled residents. [#138] City employees admit that they do not know one way or the other whether in past disasters in Los Angeles the City's emergency preparedness program adequately served persons with disabilities. [#139] Indeed there is no requirement in the City's emergency preparedness program for a performance evaluation of the program as to persons with disabilities. [#140] Finally, there also is no current effort to assess the City's emergency preparedness program as to the needs of disabled people. [#141]

### 4.   Although the City Identifies In Advance the Needs of and Resources for Its Residents During an Emergency, It Fails To Do So for Persons with Disabilities.

The City has identified both needs and resources for the general public during an emergency and has a written plan which details the processes by which needs identified

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

*CALIF, et al., v. City and County of Los Angeles*, Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

10

1   during an emergency are addressed by the existing resources. [#142]  In 2008, the City
2   began development of a resource inventory database known as Emergency Asset
3   Resource Net (EARN). [#143]  The City also calculates the number of shelter beds that
4   may be required in an emergency. [#144]

5       Experts agree and the City does not dispute that advance planning can help avoid
6   injury for persons with disabilities during an emergency. [#145]  In advance of a disaster,
7   a city must identify its shelter and transportation capacities for persons with disabilities
8   and must stockpile medications and equipment needed by disabled people. [#146]  A city
9   must also attempt to identify where persons with disabilities may be located during an
10  emergency [#147] and must set up arrangements with disability community organizations
11  to explicitly define their roles during an emergency. [#148]

12      However, the City has totally failed to identify either the needs of or the resources
13  for persons with disabilities during an emergency.  Most fundamentally, the City does not
14  identify those who may have unique needs in an emergency due to their disability. [#149]
15  Specifically, the City admits that it has not identified where persons with disabilities live
16  for purposes of responding to emergencies. [#150]  The City also admits that it has not
17  identified concentrations of persons with disabilities. [#151]  The City has not identified
18  where persons who are In Home Support Services recipients (i.e. persons who require
19  caregivers) are located. [#152]  Even first responders, such as the Police and Fire
20  Department, do not know where persons with disabilities may be located during an
21  emergency. [#153]  Mr. Featherstone, head of EMD, admits that one area in which the
22  City is "not as well-prepared" is "knowing where the disabled households are" which
23  would "help [the City] do our job much better." [#154]

24      It is undisputed that the City also has not conducted any inventory of its accessible
25  buses to match against the emergency needs of persons with disabilities. [#155]  Nor has
26  the City inventoried the Police Department's accessible vehicles [#156] or the Fire
27  Department's emergency equipment designed for persons with disabilities to determine

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

1  whether there would be an adequate supply in an emergency. [#157]  In addition, the City

2  knows neither its overall capacity of accessible shelter space [#158] nor the number of

3  accessible spaces it would need. [#159]  The City also admits that it has not stockpiled

4  medications that persons with disabilities might need [#160] and not stockpiled

5  wheelchairs or other assistive devices. [#161]

6      Finally, the City has failed to reach out to disability community organizations

7  through memorandums of understanding or other arrangements to help identify persons

8  with disabilities or to assist the City in meeting such persons' emergency needs. [#162]

9      **5.      The City Has Plans to Notify Its Residents of an Emergency But
        Has Failed to Plan for Notifying Persons With Disabilities.**

10     The City's emergency preparedness program includes provisions to notify

11  residents of an emergency. [#163]  Notifications may occur through the media. [#164]  In

12  addition, the Police Department is charged with the responsibility of notifying the public

13  in an emergency. [#165]  These notifications are typically made "through bullhorns or

14  loudspeakers" on police vehicles or in some cases door-to-door. [#166]  To the extent

15  that the Fire Department would have to make any notifications, it would use a public

16  address system. [#167]

17      Experts agree and the City does not dispute that emergency notifications must be

18  accessible to persons with sensory and cognitive disabilities [#168-169] and that such

19  persons may need special accommodations when being informed about an emergency.

20  [#170]  The City also openly admits that if there were better provision for emergency

21  notification for people with disabilities, "lives could be saved." [#171]

22      However, it is undisputed that there is no provision in the City's plans for how to

23  notify persons with disabilities in an emergency. [#172]  The City's emergency plans do

24  not provide for any specific notification to persons who are deaf. [#173]  Moreover, the

25  emergency alert system on TV does not have audio to assist persons who are blind.

26  [#174]  Nor do City emergency plans make any mention of how information would be

27  communicated to persons with cognitive disabilities. [#175]

28

Further, the Police Department has no written policies that instruct officers as to how to communicate with disabled persons in an emergency [#176] and has not performed any studies as to the efficacy of its methods for notifying persons with disabilities. [#177]  As such, the City admits that it has no way to ensure that notifications regarding emergencies will reach persons with disabilities. [#178][4]

**6.      Although the City Expects Residents to Shelter In Place, It Provides No Assistance to Persons with Disabilities To Do So.**

During an emergency, the City assumes that based on the resources it has and the severity of the disaster, it may be some period of time before the City can respond. [#180] The City admits that residents may have to take care of themselves wherever they are (e.g., their homes) for 3 to 7 days before they can expect any City support. [#181]

Experts agree and the City does not dispute that sheltering in place for 72 hours or more may be impossible for people with disabilities, in part, because persons with disabilities are disproportionately dependent on electricity [#184] and medications and may require caregivers. [#182]  The City explicitly admits that 72 hours may be too long for persons with disabilities to shelter in place. [#183]

However, the City also admits that it has no plans to provide support for persons with disabilities during the first 72 hours after an emergency. [#185]  The City's emergency program does not include any provisions to locate persons with disabilities during a disaster. [#186]  The City also has no plans to provide necessary medications [#187] or electrical power [#188] to persons with disabilities who may need either.[5]

**7.      In Providing Evacuation and Transportation to Shelters, the City Does Not Address the Needs of Persons with Disabilities.**

The City's emergency preparedness program includes efforts to assist individuals

---

[4] To the extent that the EMD, Fire Department or Police Department intend to rely on notifications via their websites, the City admits that their websites are not accessible to persons with disabilities. [#179]
[5] The Fire Department may, in limited situations, provide medical services when persons with disabilities shelter in place. [#189]  However, the Fire Department has no protocol for providing support to persons with disabilities who are sheltering in place and maintains that it is not their responsibility. [#190]  The Fire Department also admits that the 911 system may become overwhelmed, making it difficult for persons with disabilities to seek assistance. [#191]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

in evacuating to shelters or gathering points. [#192]  The Police Department admits that it is in charge of developing a plan for and initiating evacuations [#193] but that it is not responsible for "physical extrication" and instead would call the Fire Department. [#194] The Fire Department admits that it conducts search and rescue for individuals that may be unable to evacuate themselves. [#195]  In addition, the City "has the ability to work with MTA to access buses to relocate folks from a certain neighborhood to whatever location is going to be utilized as a shelter or evacuation center." [#196]

Experts agree and the City does not dispute that, for persons with disabilities, individual evacuations are not only needed when they are trapped in their homes but also if they cannot negotiate stairs and elevators are not working, if they cannot get into their wheelchairs without assistance or their mobility equipment has been damaged by the emergency, or if there is debris in their path of travel making it impossible for them to navigate. [#197-199]  Additionally, experts agree and the City does not dispute that transportation used in an evacuation must be accessible. [#200]

Yet the City admits that it has no plan for evacuating persons with disabilities. [#201][6] The City has no written plans for whether caregivers and medical equipment (e.g., wheelchairs, respirators) will be evacuated with persons with disabilities [#202], for how to address the needs of persons who have been evacuated without their assistive devices [#203] or for what happens with service animals during an evacuation. [#204]

Furthermore, the City admits it has no plans for accessible transportation during evacuations. [#209]  Indeed, the City has not identified the number of persons who may need accessible transportation in an emergency [#210] and there has been no study to determine whether MTA buses will be sufficient to meet the needs of persons with disabilities.  [#211]  In fact, MTA buses which will be used during an emergency can accommodate two wheelchairs per bus. [#212]

---

[6] For instance, the Police Department is in charge of evacuations of disabled persons [#205] but has no protocol for evacuating someone who is quadriplegic. [#206]  Instead it would seek help from the Fire Department in evacuating such a person. [#207]  However, the Fire Department also has no protocol for evacuating someone who is quadriplegic. [#208]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

8.   **The City's Mass Evacuation Plans Include No Provisions to Meet the Needs of Persons with Disabilities.**

The City plans for mass evacuation. [#213]  Currently in draft form, the plan provides "general provisions for evacuating citizens." [#214]  In the meantime, the City's current mass evacuation plan consists of designating potential routes and leaving it up to the individual residents to evacuate themselves. [#215]

Experts agree and the City does not dispute that a city must provide accessible transportation during a mass evacuation because disabled persons are less likely to own or drive a vehicle and thus, will rely on the City to evacuate them. [#216]  The City admits that it should assist persons who do not have vehicles in mass evacuations. [#217]

Once again, there are no plans for evacuating persons with disabilities from an entire area. [#218]  The City does not seem interested in remedying this situation, as its draft mass evacuation plan has no specific provisions for persons with disabilities. [#219]

9.   **The City Has No Plans for Accessible Temporary Housing.**

The City's emergency preparedness program includes providing temporary housing after an emergency. [#220]  The City provides for such temporary housing in its Recovery and Reconstruction Plan, which includes establishing tent cities, identifying large group housing and utilizing hotels. [#221]

Experts agree and the City does not dispute that temporary housing provided by a city must be accessible to persons with disabilities. [#222]  However, the City admits that it has no plan for providing accessible temporary housing. [#223]  The blame game continues, as the DoD again claims that the Red Cross is responsible for accessible temporary housing. [#224]  However, the Red Cross flatly denies that it has committed itself to do anything specific with respect to persons with disabilities [#89] and no agreement, even the unexecuted MOU, provides that it must do so. [#88, 92]

10.  **The City's Recovery Plan Fails to Provide Any Assistance to Persons with Disabilities After an Emergency.**

During the recovery phase, the City has plans to assist residents in remediating

*CALIF, et al., v. City and County of Los Angeles*, Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF

15

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204

1  damage. [#225]  This may include "reconstruction of whole neighborhoods or it may just
2  be repopulating an apartment building or a neighborhood" [#226]

3      Experts agree and the City does not dispute that persons with disabilities will
4  require specific assistance during the recovery phase, such as assistance returning to their
5  homes [#228] and assistance restoring accessible features in their homes and
6  neighborhoods. [#227]  The City admits that persons with disabilities may require special
7  accommodations during the recovery. [#229]

8      However, the City has no written plans that provide for addressing the needs of
9  persons with disabilities in the recovery phase after a disaster. [#230]  The City has no
10  plan to provide persons with disabilities assistance in returning to their homes [#231] or
11  to check in with persons with disabilities to see if they are safe. [#232]  The City also has
12  no plan to assist persons with disabilities in repairing their homes [#233] or to help fix
13  accessibility features. [#234]  Furthermore, the City has not included disability
14  community groups in planning for the recovery phase. [#235]

15  **C.**  **The Plaintiffs and City Are Covered Under Plaintiffs' Legal Claims.**

16      Plaintiff Harthorn is a resident of the City of Los Angeles [#236] and must use a
17  power wheelchair for mobility. [#237]  Organizational plaintiff Communities Actively
18  Living Independent and Free (CALIF) has constituents who are residents of the City of
19  Los Angeles and who are also disabled. [#238]  The City receives federal and state
20  funding for its emergency preparedness program. [#242-243]

21  **III.  LEGAL STANDARD**

22      Summary judgment is appropriate when "the pleadings, depositions, answers to
23  interrogatories, and admissions on file, together with the affidavits...show that there is no
24  genuine issue as to any material fact and that the moving party is entitled to a judgment
25  as a matter of law." Fed. R. Civ. P. 56(c).  "When...the moving party is a plaintiff, he or
26  she must adduce admissible evidence on all matters as to which he or she bears the
27  burden of proof." *Zands v. Nelson*, 797 F.Supp. 805, 808 (S.D.Cal. 1992); *see also*
28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204

1   *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  When a motion for

2   summary judgment is properly made and supported, an opposing party's response must

3   set out specific facts showing a genuine issue for trial. *See* Fed. R. Civ. Proc. 56(e)(2);

4   *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

5   **IV.   STATEMENT OF THE LAW**

6       **A.   <u>There Is No Genuine Issue of Material Fact As To Each Element of</u>**
        **<u>Plaintiffs' ADA and Section 504 Claims.</u>**

7         "To prove a public program or service violates Title II of the ADA, a plaintiff must

8   show: (1) he is a "qualified individual with a disability"; (2) he was either excluded from

9   participation in or denied the benefits of a public entity's services, programs or activities,

10  or was otherwise discriminated against by the public entity; and (3) such exclusion,

11  denial of benefits, or discrimination was by reason of his disability." *Weinreich v. Los*

12  *Angeles County Metropolitan Transp. Authority*, 114 F.3d 976, 978 (9th Cir. 1997); *see*

13  *also Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002); *Rodde v. Bonta*, 357 F.3d

14  988, 995(9th Cir. 2004).  To establish a violation of Section 504 of the Rehabilitation

15  Act, the plaintiff must show a violation of the ADA and that the public entity receives

16  federal funding.[7] *Armstrong v. Davis*, 275 F.3d 849, 862 n. 17 (9th Cir. 2001); *see also*

17  *Henrietta D. v Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).  Under both the ADA and

18  Section 504, the failure to provide reasonable accommodations is a form of

19  discrimination. *McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004)(ADA);

20  *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002)(Section 504).

21      **1.   The City Discriminates Against Persons with Disabilities By**
        **Failing to Provide Meaningful Access to Its Emergency**
        **Preparedness Program.**

22

23        The ADA and Section 504 prohibit many types of discrimination.  Generally,

24  where discrimination is unintentional, Courts determine whether a public entity has

25  discriminated against persons with disabilities by denying them "meaningful access" to

26

27  _____
[7] Courts generally analyze claims under Title II of the ADA together with claims under Section

28  504. *See e.g., Zukle v. Regents of University of California*, 166 F.3d 1041, 1045 n. 11 (9th Cir.
1999).

*CALIF, et al., v. City and County of Los Angeles*, Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF      17

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

1  its services, programs or activities. *See Dare v. California*, 191 F.3d 1167, 1171-72 (9th

2  Cir. 1999).  Courts have held that there is a denial of "meaningful access" when (1)

3  persons with disabilities are disproportionately burdened due to their unique needs or (2)

4  a public entity fails to provide reasonable accommodations for disabled persons.

5                              ***a.***     ***The City Denies Meaningful Access Because Its Emergency***

6                                       ***Preparedness Program Disproportionately Burdens Persons*** ***with Disabilities Due to Their Unique Needs.***

7       The Ninth Circuit has repeatedly and unequivocally held that governmental action

8  which "disproportionately burdens people with disabilities because of their unique needs

9  [is] actionable under the ADA." *Rodde*, 357 F.3d at 998 (*citing Crowder v. Kitagawa*, 81

10  F.3d 1480 (9th Cir. 1996)).

11       In *Crowder v. Kitagawa*, the Ninth Circuit adopted the "meaningful access"

12  standard.  The *Crowder* court recognized that in passing the ADA, Congress intended to

13  address not only "intentional exclusion" but also "the discriminatory effects of

14  architectural, transportation, and communication barriers, overprotective rules and

15  policies, [and] failure to make modifications to existing facilities and practices." *Id.* at

16  1483.  The Ninth Circuit found that a disparate impact analysis was not appropriate in the

17  context of disability and instead, the Court held that, when examining "discriminatory

18  effects," the inquiry should focus on whether disabled persons were denied "meaningful

19  access" to a public entity's services, programs or activities. *Id.* at 1484 (*citing Alexander*

20  *v. Choate*, 469 U.S. 287, 302 (1985).)

21       Applying this analysis, the Court found that the imposition of a 120-day quarantine

22  on carnivorous animals entering Hawaii "burdens visually-impaired persons in a manner

23  different and greater than it burdens others." *Crowder*, 81 F.3d at 1485.  The Court

24  explained that because of the unique need for guide dogs among the visually-impaired,

25  such persons cannot leave their dogs in quarantine and enjoy public services (e.g., public

26  transportation) like anyone else. *Id.* at 1484-85.  Thus, meaningful access to the public

27  services provided to others was denied to persons with vision disabilities because the

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204

*CALIF, et al., v. City and County of Los Angeles*, Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF        18

1  quarantine failed to consider their unique needs in violation of the ADA. *Id.* at 1485.

2  Using a similar approach, the Ninth Circuit in *Rodde v. Bonta* upheld a preliminary

3  injunction precluding Los Angeles County from closing a hospital that provided medical

4  care disproportionately required by persons with disabilities and not readily available

5  elsewhere in the County. *Rodde*, 357 F.3d at 998.  The court concluded that the ADA did

6  not altogether prohibit closure of the facility, but it did so in these circumstances because

7  the county had no plan for providing medically necessary services to individuals with

8  disabilities elsewhere. *Id.*  The Court found that "the evidence suggested…that the

9  services designed for the general population would not adequately serve the unique needs

10  of the disabled, who therefore would be effectively denied services that the non-disabled

11  continued to receive." *Id.*  The Court thus held that closure of the facility would deny

12  individuals with disabilities meaningful access to medical care provided by the County

13  because of their unique needs, while others would retain access to such care. *Id.*

14  Both *Crowder* and *Rodde* involved a governmental program – public services in

15  *Crowder* and medical care in *Rodde*.  Both of these programs provided benefits to

16  disabled and non-disabled persons alike.  In *Crowder*, the Court recognized that the

17  quarantine had a disproportionate burden on persons with vision disabilities in that such

18  persons would derive a lesser benefit from the state's public services because of their

19  unique need to use their guide dogs.  The *Rodde* Court also recognized that the hospital

20  closure had a disproportionate burden on persons with disabilities in that those persons

21  could not receive the same benefits from another hospital as the general population could

22  because of their unique medical needs.  Thus, in both cases the disproportionate burden

23  could be characterized as a diminution of government-offered benefits because the public

24  entities disregarded the unique needs of persons with disabilities.

25  Here too, the City is offering a governmental program – its emergency

26  preparedness program – which provides benefits, such as shelter, evacuation and

27  participation in planning, to the general public to mitigate the effects of an emergency.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

*CALIF, et al., v. City and County of Los Angeles*, Case No.: CV 09-0287 CBM (RZx)
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF

19

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

1   However, as described in the Statement of Facts, persons with disabilities cannot derive

2   the same benefits as others from the program in its current form because of their unique

3   needs and the City's failure to address those needs.  This constitutes a disproportionate

4   burden on them and a denial of meaningful access.

5   As in *Rodde*, the evidence here demonstrates that the emergency preparedness

6   program designed for the general population does not adequately address the unique

7   needs of persons with disabilities and, thus, would not provide the same benefits it does

8   to non-disabled residents.  Indeed the City admits that persons with disabilities have

9   unique needs during emergencies [#28] and that it is not as well prepared to deal with the

10  needs of disabled persons in an emergency as it is to deal with the needs of the general

11  population. [#20-21, 23]

12  As detailed in the Statement of Facts, for each of the essential components of the

13  City's emergency preparedness program the City admits that:

14  (1) it provides the component to the general public [#41-44, 94-96, 132-133, 142-

15  144, 163-167, 180-181, 192-196, 213-215, 220-221, 225-226];

16  (2) persons with disabilities have unique needs with regard to that component

17  [#45-48, 97-100, 134, 145-148, 168-171, 182-184, 197-200, 216-217, 222, 227-229]; and

18  (3) it has failed to provide for those unique needs [#49-70, 103-131, 135-141, 149-

19  162, 172-179, 185-191, 201-212, 218-219, 223-224, 230-235] and, thus, denies

20  meaningful access to its emergency preparedness program for persons with disabilities.

21  ***b.*     *The City Denies Meaningful Access By Failing to Provide***

22  ***Reasonable Accommodations for Its Emergency***
    ***Preparedness Program.***

23  Discrimination also can occur if a public entity fails to make reasonable

24  modifications.[8]  *See* 28 C.F.R. § 35.130(b)(7).  Some courts have treated reasonable

25  accommodations as a second step in the meaningful access analysis.  That is, courts have

26

27  _____
    [8] Although Title II of the ADA uses the term "reasonable modification," rather than "reasonable

28  accommodation," these terms create identical standards. *See Wong v. Regents of Univ. of Cal.,* 192 F.3d 807, 816 n. 26 (9th Cir. 1999). Thus, these terms are used interchangeably.

1   found that where persons with disabilities are uniquely burdened and denied meaningful
2   access, reasonable accommodations must follow. *See Crowder*, 81 F.3d at 1485.  Given
3   that the City acknowledges that persons with disabilities have unique needs in accessing
4   its emergency preparedness program and given that the City nonetheless has not
5   attempted to provide reasonable accommodations, the City is further violating the law.

6        Courts have also held that a failure to provide reasonable accommodations can be a
7   stand-alone claim, itself a denial of meaningful access. *See Alexander v. Choate*, 469
8   U.S. 287, 301 (1985)("to assure meaningful access, reasonable accommodations in the
9   grantee's program or benefit may have to be made.")  Failure to provide a reasonable
10  accommodation is actionable discrimination under the ADA "because the ADA not only
11  protects against disparate treatment, it also creates an affirmative duty in some
12  circumstances to provide special, preferred treatment, or "reasonable accommodation.""
13  *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F.Supp. 962, 965 (N.D.Cal. 1998).  Indeed
14  "[t]he purpose of the ADA's reasonable accommodation requirement is to guard against
15  the facade of "equal treatment" when particular accommodations are necessary to level
16  the playing field." *McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004); *see*
17  *also Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F.Supp. 2d 1134, 1136 (N.D.Cal.
18  1998) ("[i]n the context of disability…equal treatment may not beget equality").

19       Unlike *Crowder* and *Rodde*, the reasonable accommodation analysis is not based
20  on a comparative approach.  In *McGary v. City of Portland*, the Ninth Circuit held that
21  "[a] plaintiff need not allege either disparate treatment or disparate impact in order to
22  state a reasonable accommodation claim." *McGary*, 386 F.3d at 1266; *see also Henrietta*
23  *D. v. Bloomberg*, 331 F.3d 261, 276-77 (2d Cir. 2003) ("[A] claim of discrimination
24  based on a failure reasonably to accommodate is distinct from a claim of discrimination
25  based on disparate impact."), *cert. denied*, 541 U.S. 936 (2004)).  Citing to the Supreme
26  Court's holding in *Olmstead*, the Ninth Circuit further explained that a reasonable
27  accommodation claim need not include a "comparison class" that was treated differently.
28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204

1   *McGary*, 386 F.3d at 1266 (*citing Olmstead v. Zimring*, 527 U.S. 581, 598 (1999)).

2   Specifically, the *McGary* Court found that Portland discriminated against McGary by

3   failing to reasonably accommodate his disability when it refused to grant him additional

4   time to comply with a nuisance abatement ordinance.  The Ninth Circuit rejected the

5   district court's finding that in order for McGary to allege that he was discriminated

6   against because of his disability, he must demonstrate that a non-disabled neighbor also

7   in violation of the ordinance was given an extension of time.

8       Plaintiffs submit that meaningful access has been denied pursuant to the *Crowder*

9   and *Rodde* analyses alone.  That is, the City admits that all essential components of its

10  emergency preparedness program are provided to the general public, the City admits that

11  persons with disabilities have unique needs that do not allow them to have the full

12  assistance offered by the emergency preparedness program and the City admits that it has

13  not met those unique needs.

14      However, in the alternative and under the *McGary* analysis, Plaintiffs need not

15  even show that the City provides particular components of an emergency preparedness

16  program for the general public.  Rather, Plaintiffs need only demonstrate that the City

17  failed to take the affirmative actions needed to level the playing field for persons with

18  disabilities.  Accordingly, the City cannot claim that because it does not provide certain

19  components to any of its residents, it need not provide these components to persons with

20  disabilities.

21      For example, even if the Court were to conclude that the City does not provide for

22  other residents when they are sheltering in place, the City would still have an obligation

23  under the reasonable accommodation theory to provide assistance to persons with

24  disabilities.  Without taking affirmative actions, persons with disabilities would not have

25  the same chance of survival when sheltering in place as non-disabled persons (e.g.,

26  someone on a respirator could not breathe without electricity).  Accordingly, the City

27  may need to prioritize restoration of electricity or evacuation for persons with disabilities.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

1    However, it is not necessary, at this time, to consider what exactly the City must do since

2    the Court is determining only liability through this motion.

3    　　　　　**2.　　Plaintiffs Have Satisfied the Other Elements Under the ADA and Section 504.**

4    　　　　First, it is undisputed that Plaintiffs are qualified individuals with disabilities. *See*

5    28 C.F.R. § 35.104.  Plaintiff Harthorn is a resident of the City and is substantially

6    limited in the life activity of walking. [#236-237]  CALIF's constituents are, like Plaintiff

7    Harthorn, residents of the City who have disabilities [#238]. [9]  Moreover, the City has

8    stipulated to and this Court certified the following class:

9

> all people with disabilities, as defined by the Americans with
10 > Disabilities Act, who are within the City of Los Angeles and
> the jurisdiction served by the City of Los Angeles' and County
11 > of Los Angeles' emergency preparedness programs and
> services.

12    　　　　By definition, any member of the class is a qualified person with a disability.

13    　　　　Second, denial of meaningful access is based solely on disability in so much as the

14    City provides an emergency preparedness program to the general public but that program

15    is inaccessible to persons with disabilities. [#21-22]  Third, the City receives federal

16    funding for its emergency preparedness program. [#242]

17    　　**B.　　There Is No Genuine Issue of Material Fact As To Plaintiffs' Claims Under California Law.**

18

19    　　　　**1.　　The City Violates the Disabled Persons Act By Failing to Provide Full and Equal Access to Its Emergency Preparedness Program.**

20    　　　　The City is liable for violating the California Disabled Persons Act ("DPA"), Cal.

21    Civil Code §§ 54 *et seq.* which guarantees persons with disabilities "full and equal

22    access" to places of public accommodation.  The DPA explicitly states, and courts have

23    recognized, that a violation of the rights of an individual under the ADA is a per se

24    violation of the DPA. *See* Cal. Civ. Code § 54(c); see also *Hubbard v. SoBreck*, 554 F.3d

25    742, 745 (9th Cir. 2009).  Accordingly, this Court may find, without further analysis, that

26

27    ────────────────

[9] The issue of standing is a separate issue.  To the extent there is dispute as to standing, Plaintiffs
28    have set forth the relevant facts which satisfy the requirements. [#239-241]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

1  the City has violated the ADA and as a result, has also violated the DPA.  To the extent

2  that the Court seeks to conduct a separate analysis under the DPA, the statute explicitly

3  includes, among the public accommodations covered, all "public conveyances or modes

4  of transportation (whether private, public or franchised, licensed, contracted or otherwise

5  provided)," and "lodging places" and "hotels." Cal. Civ. Code § 54.1(a)(1).  Plaintiffs

6  thus maintain that the DPA undeniably applies at least to the following major

7  components of the City's emergency preparedness program: any type of evacuation

8  requiring transportation and any type of lodging, including both shelters and temporary

9  housing.[10]  As described above, none of these are fully and equally accessible to persons

10 with disabilities. *See* Section B.

### 2.  The City Violates California Government Code Section 11135 By Failing to Provide Full and Equal Access to Its Emergency Preparedness Program.

13      The City has also unlawfully violated Section 11135 of the California Government

14 Code which prohibits any program or activity that receives financial assistance from the

15 state from denying "full and equal" access to persons with disabilities. Cal Gov. Code §

16 11135(a).  Section 11135 is most commonly analyzed in the context of Section 504

17 because courts have held that "California Government Code § 11135 is identical to the

18 Rehabilitation Act except that the entity must receive State financial assistance rather

19 than Federal financial assistance." *D.K. ex rel. G.M. v. Solano County Office of Educ.*,

20 667 F.Supp.2d 1184, 1191 (E.D.Cal. 2009); *see also Williams v. Grannis*, 2010 WL

21 1405488 (E.D.Cal. 2010)(slip copy).  Thus, if there is a violation of Section 504 and the

22 public entity receives state funding, then there has been a violation of Section 11135.

23 Here it is undisputed that the City receives state funding. [#243]  Further, as with the

24 DPA, Section 11135 incorporates the protections and prohibitions of the ADA and its

25 implementing regulations. Cal. Gov. Code § 11135(b).  Thus, a violation of the ADA or

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204

---

27 [10] Some courts have extended the DPA analysis beyond architectural barriers to include

28 programs as well.  In which case, the entire emergency preparedness program would be covered by the DPA. *See Hankins v. El Torito Restaurants, Inc.*, 63 Cal.App.4th 510, 523 (1998).

1  any of its implementing regulations is a violation of Section 11135.  Accordingly, the

2  Court should find that the City has violated Section 11135 if the City has violated the

3  ADA and/or Section 504.

### C.    The Court Need Not Determine The Remedy At This Stage.

5      The determination of liability prior to consideration of remedies is "a path well-

6  worn by equity judges overseeing complex, institutional litigation." *Henrietta D. v.*

7  *Giuliani*, 246 F.3d 176, 182 (2d Cir. 2001).  It is well within this Court's authority to

8  grant Plaintiff's motion as to the City's liability. *See, e.g., Fortyune v. Am. Multi-Cinema,*

9  *Inc.*, 2002 U.S. Dist. LEXIS 27960*44 (C.D. Cal. 2002); *Grace Church v. City of San*

10  *Diego*, 555 F. Supp. 2d 1126, 1142 (S.D. Cal. 2008).  For instance, in a disability

11  discrimination case in which plaintiffs asked the court to "declare [defendant's] *legal*

12  *responsibility* to accommodate plaintiffs' disabilities," the court granted plaintiffs' motion

13  for partial summary judgment as to liability while postponing the determination of relief.

14  *Celano v. Marriott Intern., Inc.*, 2008 U.S. Dist. LEXIS 6172, *60 (N.D.Cal. 2008).

15      The Court may then choose from a wide range of procedural devices and remedies

16  to bring the case to a conclusion. *Milliken v. Bradley*, 433 U.S. 267, 281 (1977)(finding

17  that the scope of a district court's equitable powers is broad).  For example, the Court

18  could order the parties to propose a plan jointly, under the supervision of a magistrate

19  judge. *See Celano*, at *60 (after entering declaratory judgment finding defendant liable,

20  court set a conference in front of a magistrate judge to permit the parties to address the

21  scope of relief); *accord Henrietta D. v. Giuliani*, 246 F.3d at 181 (Title II ADA case in

22  which court appointed magistrate judge to work with the parties to determine remedies).

### V.    CONCLUSION

24      Plaintiffs respectfully request that this Court grant Plaintiffs' motion for summary

25  judgment.

26  //

27  //

28  //

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA, 94704-1204

1  DATED: August 2, 2010

Respectfully submitted,

2  DISABILITY RIGHTS ADVOCATES

3  DISABILITY RIGHTS LEGAL CENTER

4

5  _____/s/_____

6  Mary-Lee K. Smith
   Attorneys for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  \\server\Cases\CALIF.LA\Pleadings\MSJ\Notice_Motion_SJ_FINAL.doc

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

*CALIF, et al., v. City and County of Los Angeles,* **Case No.: CV 09-0287 CBM (RZx)**
**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

26