DISABILITY RIGHTS ADVOCATES
SID WOLINSKY (SBN 33716)
swolinsky@dralegal.org
MARY-LEE SMITH (SBN 239086)
msmith@dralegal.org
KARLA GILBRIDE (SBN 264118)
kgilbride@dralegal.org
2001 Center Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 665-8644
Fax: (510) 665-8511; TTY: (510) 665-8716

DISABILITY RIGHTS LEGAL CENTER
PAULA PEARLMAN (SBN 109038)
Paula.pearlman@lls.edu
SHAWNA L. PARKS (SBN 208301)
Shawna.parks@lls.edu
919 Albany Street
Los Angeles, CA 90015
Telephone: (213) 736-1031
Fax: (213) 736-1428; TTY: (213) 736-8310
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMUNITIES ACTIVELY LIVING INDEPENDENT AND FREE, a nonprofit corporation, and AUDREY HARTHORN, an individual, on behalf of themselves and ALL OTHERS SIMILARLY SITUATED,<br><br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a public entity, and COUNTY OF LOS ANGELES, a public entity,<br>　　　　　　　　Defendants. | **Case No.: CV 09-0287 CBM (RZx)**<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Pretrial Conference: February 7, 2011<br>Time: 2:30pm.<br>Courtroom: 2<br><br>Action Filed:  January 14, 2009<br>Judge:  Hon. Consuelo B. Marshall |

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

# TABLE OF CONTENTS

I.    Introduction.................................................................................................1

II.   Claims and Defenses...................................................................................2

    A.    Plaintiffs Plan to Pursue All Claims Pled in their Complaint.................2

    B.    The City Has Violated Both Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. ...........................................3

        1.    Elements of Title II and Section 504 Claims...............................3

        2.    The Named Plaintiffs and the Plaintiff Class Are Qualified Individuals with Disabilities. ...................................................................3

        3.    Plaintiffs Have Been Excluded from Participation in or Denied the Benefits of the City's Emergency Preparedness Program or Have Otherwise Been Discriminated Against by the City....................4

            a.    The City Denies Meaningful Access Because Its Emergency Preparedness Program Disproportionately Burdens Persons with Disabilities Due to their Unique Needs.....................4

                (1)    Courts Prohibit Government Action that Disproportionately Burdens Persons with Disabilities Because of their Unique Needs. ...............................4

                (2)    There Is Overwhelming Evidence that the City Ignores the Unique Needs of Persons with Disabilities in Its Emergency Preparedness Program..........................7

                    (a) In Planning for Shelter and Care, the City Fails to Include the Needs of Persons with Disabilities...............7

                    (b) In Creating Its Emergency Plans, the City Fails to Include Input From the Disability Community...............9

                    (c) The City Regularly Assesses the Efficacy of Its Plans But Does Not Assess their Effectiveness for Persons with Disabilities.................................................................11

                    (d) Although the City Identifies the Needs of and Resources for Its Residents During an Emergency, It Fails to Do So for Persons with Disabilities. .................12

                    (e) The City Has Plans to Notify Its Residents of an Emergency But Has Failed to Plan for Notifying Persons with Disabilities...................................................................13

                    (f) Although the City Expects Residents to Shelter in Place, It Provides No Assistance to Persons with Disabilities to Do So. ...............................................14

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

(g) In Providing Evacuation and Transportation to Shelters, the City Does Not Address the Needs of Persons with Disabilities. ................................14

(h) The City's Mass Evacuation Plans Include No Provisions to Meet the Needs of Persons with Disabilities. ................................................15

(i) The City's Plans For Temporary Housing Do Not Address Accessible Temporary Housing. .....................16

(j) The City's Recovery Plan Fails to Provide Any Assistance to Persons with Disabilities After an Emergency. ..............................................16

b.      The City Denies Meaningful Access By Failing to Provide Reasonable Accommodations for Its Emergency Preparedness Program ................................................17

(1)   The City Must Provide Reasonable Accommodations to Persons with Disabilities Independent of What It Offers Non-Disabled Persons. .............................17

(2)   The Evidence Demonstrates that Reasonable Accommodations May Require Providing Assistance Not Offered to Non-Disabled Persons. ..........................18

4.   The Discrimination Against Persons with Disabilities Is by Reason of their Disabilities. ................................................19

5.   The City Is a Public Entity and a Recipient of Federal Funds. ....21

C.   The City Has Violated California Government Code § 11135. ..............21

1.   Elements of a Section 11135 Claim ..............................................21

2.   Plaintiffs Have Met All The Elements of a Section 11135 Claim. ................................................21

D.   The City Has Violated California Civil Code § 54 ................................22

1.   Elements of a DPA Claim ............................................................22

2.   Plaintiffs Have Met All The Elements of a DPA Claim ..............22

E.   Defenses Asserted by the City Are Without Merit. ................................23

1.   The City Has Relied On Several Defenses in this Action. ...........23

2.   There is No Evidence that Providing Greater Specificity in City Emergency Plans Constitutes a Fundamental Alteration ..............23

3.   Personal Preparedness Is Not an Affirmative Defense. ................24

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

　　　　　4.　　Providing Individual Accommodations After an Emergency Occurs Is Not a Defense to Plaintiffs' Claims of Discrimination.................24

　　　　　5.　　The "Viewed In Its Entirety" Standard Is Inapplicable. ...............25

III.　Additional Issues ..........................................................................................25

　　A.　Evidentiary Issues and Issues of Law ....................................................25

　　B.　Bifurcation of Issues.............................................................................25

　　C.　Jury Trial ............................................................................................25

　　D.　Attorneys' Fees....................................................................................25

　　E.　Abandonment .....................................................................................25

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Choate,*
  469 U.S. 287 (1985) ................................................................ 5, 17, 23

*Armstrong v. Davis,*
  275 F.3d 849 (9th Cir. 2001) ........................................................ 3

*Bay Area Addiction Research and Treatment, Inc. v. City of Antioch,*
  179 F.3d 725 (9th Cir. 1999) ....................................................... 24

*Crowder v. Kitagawa,*
  81 F.3d 1480 (9th Cir. 1996) ..................................................... 5, 17

*D.K. ex rel. G.M. v. Solano County Office of Educ.,*
  667 F. Supp.2d 1184 (E.D.Cal. 2009) ........................................... 21

*Dadian v. Village of Wilmette,*
  269 F.3d 831 (7th Cir. 2001) ....................................................... 23

*Dare v. California,*
  191 F.3d 1167 (9th Cir. 1999) ....................................................... 4

*Dunlap v. Ass'n of Bay Area Gov'ts,*
  996 F. Supp. 962 (N.D.Cal. 1998) ................................................ 17

*Hankins v. El Torito Restaurants, Inc.,*
  63 Cal.App.4th 510 (1998) .......................................................... 23

*Henrietta D. v. Bloomberg,*
  331 F.3d 261 (2d Cir. 2003) ...................................................... 3, 18

*Hubbard v. SoBreck,*
  554 F.3d 742 (9th Cir. 2009) ....................................................... 22

*Lee v. City of Los Angeles,*
  250 F.3d 668 (9th Cir. 2001) ....................................................... 24

*Lovell v. Chandler,*
  303 F.3d 1039 (9th Cir. 2002) ....................................................... 3

*McGary v. City of Portland,*
  386 F.3d 1259 (9th Cir. 2004) ................................................. 17, 18

*Olmstead v. Zimring,*
  527 U.S. 581 (1999) .................................................................. 18

*Presta v. Peninsula Corridor Joint Powers Bd.,*
  16 F. Supp. 2d 1134 (N.D.Cal. 1998) ........................................... 17

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

*Rodde v. Bonta*,
   357 F.3d 988 (9th Cir. 2004) .................................................................. 3, 5, 6

*Tennessee v. Lane*,
   541 U.S. 509 (2004) ................................................................................. 23

*Vinson v. Thomas*,
   288 F.3d 1145 (9th Cir. 2002) ................................................................. 17

*Weinreich v. Los Angeles County Metropolitan Transp. Authority*,
   114 F.3d 976 (9th Cir. 1997) ............................................................... 3, 19

*Williams v. Grannis*,
   2010 WL 1405669 (E.D.Cal. 2010) ........................................................ 21

*Wong v. Regents of Univ. of Cal.*,
   192 F.3d 807 (9th Cir. 1999) ................................................................... 17

*Yeskey v. Pa. Dep't of Corr.*,
   118 F.3d 168 (3d Cir. 1997), *aff'd*, 524 U.S. 206 (1998) ......................... 24

*Zukle v. Regents of University of California*,
   166 F.3d 1041 (9th Cir. 1999) ................................................................... 3

**Federal Regulations**

28 Code of Federal Regulation § 35.104 ........................................................ 4

28 Code of Federal Regulation § 35.130(b)(7) ............................................. 17

28 Code of Federal Regulation § 35.150 ....................................................... 25

**Federal Statutes**

42 United States Code §12131(2) .................................................................... 4

**State Regulations**

California Civil Code § 54(c) ......................................................................... 22

California Civil Code § 54.1(a)(1) ................................................................. 22

California Government Code § 11135(a) ........................................................ 21

California Government Code § 11135(b) ........................................................ 21

California Government Code § 12926 ............................................................. 22

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

Pursuant to Local Rule 16-4, Plaintiffs hereby submit the following Memorandum of Contentions of Fact and Law.

## I.   INTRODUCTION

The City of Los Angeles has a comprehensive emergency preparedness program. However, the City's program is woefully deficient in addressing the needs of persons with disabilities.  In a scathing critique of the City's emergency preparedness program, the City's own Department on Disability concluded:

> Angelinos with disabilities will continue to be at-risk for suffering and death in disproportionate numbers, unless the City family drastically enhances the existing disability-related emergency management and disaster planning process and readiness as required by the ADA and other statutes.

The City has not heeded this warning.  Instead, it continues to discriminate against persons with disabilities by denying "meaningful access" under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act and "full and equal access" under California's Government Code Section 11135 and California's Civil Code Section 54 to its emergency preparedness program.

Meaningful access is denied (1) when a public entity provides a governmental program which does not address the unique needs of persons with disabilities and thus, places a disproportionate burden on persons with disabilities or (2) when a public entity provides a governmental program but fails to provide reasonable accommodations such that it is difficult or impossible for persons with disabilities to receive the benefits from the program.  Full and equal access is denied when access to programs receiving state funding or access to places to which the public is invited is not the same for persons with disabilities as compared to the general public.

The evidence overwhelmingly proves that the City is denying both meaningful access and full and equal access to persons with disabilities.

- Though shelter and care is the centerpiece of its emergency preparedness program, the City has surveyed only 12 to 14 of its approximately 200 shelters

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

for architectural accessibility. The City has also made no efforts to assure that care offered at the shelters will meet the needs of persons with disabilities.

- Though the City seeks community input in its emergency planning, it has utterly failed to include the input of disability community organizations in any aspect of planning for disasters. The City does not utilize the numerous reports about the needs of persons with disabilities during emergencies nor does it study the experiences of other jurisdictions to learn about emergency preparedness for persons with disabilities.

- The City has yet to conduct any assessment of the efficacy of its emergency plans in serving persons with disabilities. The City has also failed entirely to identify the needs of persons with disabilities or to determine whether it has the capacity to meet those needs.

- Though the City acknowledges that it must provide an emergency notification system accessible to persons with disabilities, it has no protocols for notifying such persons in an emergency. Nor does the City have protocols for evacuating disabled residents from their homes or for providing accessible transportation to shelters.

- The City has made no provisions whatsoever in its emergency plans to support persons who must shelter in place for the first 72 hours after a disaster, to include persons with disabilities in either mass or more limited evacuations, to provide accessible temporary housing or to repair accessibility features (e.g., ramps) in the recovery phase of an emergency.

Based on this and other evidence, Plaintiffs will prove that the City is violating both federal and state nondiscrimination laws.

## II. CLAIMS AND DEFENSES

### A. <u>Plaintiffs Plan to Pursue All Claims Pled in their Complaint.</u>

In their complaint, filed on January 14, 2009, Plaintiffs pled the following claims:

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

- Claim 1:  Defendant has violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*
- Claim 2:  Defendant has violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*
- Claim 3:  Defendant has violated California Civil Code § 54 *et seq.*
- Claim 4:  Defendant has violated California Government Code § 11135 *et seq.*

Plaintiffs plan to pursue all of the above claims at trial.

**B.   The City Has Violated Both Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.**

**1.   Elements of Title II and Section 504 Claims**

"To prove a public program or service violates Title II of the ADA, a plaintiff must show: (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Weinreich v. Los Angeles County Metropolitan Transp. Authority*, 114 F.3d 976, 978 (9th Cir. 1997); *see also Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002); *Rodde v. Bonta*, 357 F.3d 988, 995(9th Cir. 2004).  To establish a violation of Section 504 of the Rehabilitation Act, the plaintiff must show a violation of the ADA and that the public entity receives federal funding.[1] *Armstrong v. Davis*, 275 F.3d 849, 862 n. 17 (9th Cir. 2001); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

**2.   The Named Plaintiffs and the Plaintiff Class Are Qualified Individuals with Disabilities.**

The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications…meets the essential eligibility requirements for the receipt of services or the participation in programs or activities

---

[1] Courts generally analyze claims under Title II of the ADA together with claims under Section 504. *See, e.g.*, *Zukle v. Regents of University of California*, 166 F.3d 1041, 1045 n. 11 (9th Cir. 1999).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

provided by a public entity." 42 U.S.C.§12131(2).  "Disability means, with respect to an individual, a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 28 C.F.R. § 35.104.

Plaintiff Harthorn is a qualified person with a disability.  She is substantially limited in the life activity of walking, among other things.  Further, she meets the essential eligibility requirement for the participation in programs provided by the City which is residency in the City of Los Angeles (since the City's program of emergency preparedness is offered to all residents).  Organizational plaintiff CALIF has constituents who are substantially limited in major life activities (e.g., walking, seeing) and who are also residents of the City of Los Angeles.  The City has stipulated to and this Court certified the following class:

> all people with disabilities, as defined by the Americans with Disabilities Act, who are within the City of Los Angeles and the jurisdiction served by the City of Los Angeles' and County of Los Angeles' emergency preparedness programs and services.

Thus, by definition, any member of the class is a qualified person with a disability.

### 3. Plaintiffs Have Been Excluded from Participation in or Denied the Benefits of the City's Emergency Preparedness Program or Have Otherwise Been Discriminated Against by the City.

Generally, where discrimination is unintentional, Courts determine whether a public entity has discriminated against persons with disabilities by denying them "meaningful access" to its services, programs or activities. *See Dare v. California*, 191 F.3d 1167, 1171-72 (9th Cir. 1999).  Courts have held that there is a denial of "meaningful access" when (1) persons with disabilities are disproportionately burdened due to their unique needs or (2) a public entity fails to provide reasonable accommodations for persons with disabilities.

### a. *The City Denies Meaningful Access Because Its Emergency Preparedness Program Disproportionately Burdens Persons with Disabilities Due to their Unique Needs.*

#### (1) Courts Prohibit Government Action that Disproportionately Burdens Persons with Disabilities Because of their Unique Needs.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

The Ninth Circuit has repeatedly and unequivocally held that governmental action which "disproportionately burdens people with disabilities because of their unique needs [is] actionable under the ADA." *Rodde*, 357 F.3d at 998 (*citing Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996).

In *Crowder*, the Ninth Circuit adopted the "meaningful access" standard. The *Crowder* Court recognized that in passing the ADA, Congress intended to address not only "intentional exclusion" but also "the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, [and] failure to make modifications to existing facilities and practices." *Id*. at 1483. The Court held that, when examining "discriminatory effects," the inquiry should focus on whether disabled persons were denied "meaningful access" to a public entity's services, programs or activities. *Id*. at 1484 (*citing Alexander v. Choate*, 469 U.S. 287, 302 (1985)).

Applying this analysis, the Court found that the enforcement of a 120-day quarantine on carnivorous animals entering Hawaii "burdens visually-impaired persons in a manner different and greater than it burdens others." *Crowder*, 81 F.3d at 1485. The Court explained that because of the unique need for guide dogs among the visually-impaired, such persons cannot leave their dogs in quarantine and enjoy public services (e.g., public transportation) like anyone else. *Id*. at 1484-85. Thus, meaningful access to public services was denied to persons with vision disabilities because, by imposing the quarantine, Hawaii failed to consider their unique needs, violating the ADA. *Id*. at 1485.

Using a similar approach, the Ninth Circuit in *Rodde v. Bonta* upheld a preliminary injunction precluding Los Angeles County from closing a hospital that provided medical care required by persons with disabilities and not readily available elsewhere in the County. *Rodde*, 357 F.3d at 998. The court concluded that the ADA did not altogether prohibit closure of the facility, but it did so in these circumstances because the county had no plan for providing medically necessary services to individuals with disabilities elsewhere. *Id*. The Court found that "the evidence suggested…that the services designed

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

1   for the general population would not adequately serve the unique needs of the disabled,

2   who therefore would be effectively denied services that the non-disabled continued to

3   receive." *Id.* The Court thus held that the County's closure of the facility would deny

4   individuals with disabilities meaningful access to medical care provided by the County,

5   while others would retain access to such care. *Id.*

6   Both *Crowder* and *Rodde* involved a governmental program which provided

7   benefits to disabled and non-disabled persons alike. However, in both *Crowder* and

8   *Rodde*, the public entities lessened the benefits of the governmental program for persons

9   with disabilities by taking actions that ignored the unique needs of persons with

10   disabilities. In *Crowder*, the Court recognized that some persons with vision disabilities

11   had a unique need, namely to use their guide dogs to access the state's public services.

12   The *Crowder* Court then held that the state's enforcement of the quarantine had a

13   disproportionate burden on persons with vision disabilities because, without their guide

14   dogs, such persons could not access the state's public services and thus, would derive a

15   lesser benefit from such services than non-disabled persons. Similarly, the *Rodde* Court

16   recognized that persons with disabilities had unique medical needs that could be met only

17   at a specialized hospital. The *Rodde* Court then held that the County's closure of the

18   specialized hospital had a disproportionate burden on persons with disabilities because

19   those persons could not receive the same benefits from another hospital as the general

20   population could due to their unique medical needs. Thus, in both cases the

21   disproportionate burden stemmed from a diminution of government-offered benefits

22   because the public entities disregarded the unique needs of persons with disabilities.

23   Here too, the City offers a governmental program – its emergency preparedness

24   program – which is intended to mitigate the impact of emergencies on both disabled and

25   non-disabled residents. The program addresses ten essential components:

26       1. Planning for shelter and care for persons forced to evacuate their homes;

27       2. Creating emergency plans (which includes involving community groups in

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

the development of such plans and putting detailed plans in writing);

3.   Assessing the efficacy of emergency plans;

4.   Identifying both needs and resources in advance of an emergency;

5.   Planning for notification to residents in the event of an emergency;

6.   Determining if individuals should shelter in place (e.g., for an initial period after an emergency or when it is not appropriate to evacuate their homes);

7.   Planning for assistance to individuals to evacuate their homes and travel to shelters or gathering points for further evacuation;

8.   Planning for mass evacuation from the entire area of a disaster;

9.   Planning for temporary housing for those who cannot immediately return home once shelters close;

10. Planning for recovery and remediation efforts after the emergency.

However, as in *Crowder* and *Rodde*, the City's administration of its emergency preparedness program ignores the unique needs of persons with disabilities and thus, lessens the benefits of the program for persons with disabilities.  This results in a disproportionate burden on persons with disabilities and a denial of meaningful access.

### (2)   There Is Overwhelming Evidence that the City Ignores the Unique Needs of Persons with Disabilities in Its Emergency Preparedness Program.

#### (a)   In Planning for Shelter and Care, the City Fails to Include the Needs of Persons with Disabilities.

The City's own Department of Recreation and Parks is responsible for "ensuring that the City has a shelter and welfare plan to support the immediate evacuation needs of the victims."  The City has identified some 200 shelter sites, all under the jurisdiction of the City's Recreation and Parks Department.  Experts agree that persons with disabilities have unique needs that require shelters to be accessible, both architecturally and with respect to the care that they offer.  Yet, the City has no idea which, if any, of its 200 shelter sites are accessible, either architecturally or as to the care offered.  Thus, in an emergency, neither the city nor consequently persons with disabilities know which

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

shelters are accessible.

The City's attempts at ensuring architectural accessibility are woefully inadequate. The City first began surveying its 200 shelter sites for ADA compliance in March of 2010. The initial surveys were "quick checks," which cannot determine whether a shelter is fully accessible.  That is, a facility passing a "quick check" may not actually be accessible under the requirements of the ADA.  The City later began "full" surveys at a leisurely pace of 2 shelters once or twice a month.  In June of 2010, it had still surveyed only 12 to 14 of its 200 shelter sites all of which were found to have accessibility problems.  In addition, the City has chosen to rely on City employees who are inexperienced in conducting such surveys and has not consulted any outside experts for these surveys.  As a result, the surveys are not being conducted correctly.[2]

Further, no effort whatsoever has been made to ensure that the care offered at its shelters is accessible.  For instance, the City's survey does not evaluate what medical supplies may be needed for persons with disabilities at shelters, such as medications (e.g., insulin), durable medical equipment (e.g., wheelchairs) and respirators.  The City also does not know which, if any, of its 200 shelter sites have refrigeration capabilities for medication.  The City also has no policies regarding service animals at shelters or about keeping persons with disabilities together with their families at shelters.

Faced with these remarkable deficiencies in shelters, the City plays the "blame game."  Starting with its unsuccessful motion to dismiss this case, the City has argued that the Red Cross is the entity responsible for shelter management.  Though having no plan to supervise, inspect or evaluate the Red Cross's work, city employees testified during depositions that responsibility for shelter access lies with the Red Cross, claiming that the Red Cross will take care of the needs of persons with disabilities by supplying medications and any equipment needed by persons with disabilities, providing backup

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

---

[2] For example, ramps that exceed a certain slope are inaccessible to persons with mobility disabilities.  Yet, the city employees are not using any tool to measure such slopes at the shelters but instead they are "eyeballing" the slopes.  As a result, the City does not know whether the ramps at any shelter sites are ADA compliant.

power (e.g., for charging a power wheelchair), meeting any special dietary needs for persons with disabilities, and ensuring that caregivers are able to remain with disabled persons in shelters.

However, the Red Cross states that it is not responsible for shelter accessibility. The Red Cross is not responsible for shelter compliance with the ADA or the accessibility of shelters selected and has not evaluated shelter sites for accessibility.  The Red Cross is also not responsible for medical supplies, insulin, backup generators, or accessible cots at any shelters; or for accommodating any special dietary needs of persons with disabilities; or for what will happen to service animals in a shelter (e.g. feeding and toileting).  Indeed, the Red Cross has no agreement with the City setting forth any obligations of the Red Cross in an emergency.  Moreover, there is no agreement between the City and the Red Cross in which the Red Cross has committed itself to do anything specific with respect to people with disabilities.[3]  Though the City tries to place the responsibility for accessible shelters on the Red Cross, the City admits that even an MOU with the Red Cross would not ensure accessibility.

> (b)   In Creating Its Emergency Plans, the City Fails to Include Input From the Disability Community.

The City includes the input of a wide variety of community groups in its emergency planning.  Indeed the City created the Emergency Network of Los Angeles (ENLA), the mission of which is to enhance preparedness and coordinate response to disasters through linkages among the private sector and the City.  ENLA represents the diverse interests of thirty non-profit organizations.

Experts agree that input into planning from the disability community – whether from community organizations, reports or the experience of other jurisdictions – is critical.  Inclusion not only ensures that the disability community has an equal role in

---

[3] The City and the Red Cross have been "working on" a memorandum of understanding since at least 2008.  It has never been executed.  Further, the MOU does not assign any duties with regard to providing accessible shelters.  It only states "[t]he City and Red Cross will mutually ensure to the fullest extent possible that disaster relief operations within the City will be equally accessible to persons with disabilities and the elderly."

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

planning to that of other community groups, it also ensures that the unique needs of persons with disabilities are made known and addressed in all other essential components of emergency preparedness.

Despite the critical importance of disability community input, the City has utterly failed to include such input when creating its emergency plans.  The City's top officials and other staff have had no contact with disability organizations.  The City has not consulted any disability community organizations to get input on the City's emergency plans.  ENLA does not include even one disability community organization and has no committee that focuses on disability issues.  The City's emergency preparedness program does not have a disability coordinator.

The City has further failed to incorporate any input from other disability perspectives.  City employees have not even looked at the plans of other jurisdictions concerning emergency needs of persons with disabilities nor have they read reports from any disability organization, national or local, about improving disability emergency planning.  Furthermore, the City has not hired any outside expert to analyze its emergency planning for persons with disabilities.

The City attempts to excuse its continued exclusion of disability community input by claiming to consult its own employees at the Department on Disability ("DoD").  Yet the City's Emergency Management Department ("EMD") is unaware of what the DoD actually does or the scope and degree of its expertise.  The DoD has no full time staff dedicated to emergency planning and there is no formal structure for coordination or meetings between the EMD and the DoD.  There is also no representative from the DoD on the Emergency Operations Board.  Furthermore, the EMD is free to reject any or all recommendations of the DoD.  Indeed James Featherstone, head of the EMD, cannot recall ever adopting any improvement in disaster planning for people with disabilities based on any DoD input.

In fact, the DoD has provided substantial input on which EMD could have acted.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

*CALIF, et al., v. City and County of Los Angeles,* Case No.: CV 09-0287 CBM (RZx)
PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW          10

In August of 2008, the Department on Disability wrote to Mr. Featherstone, stating:

> "[i]t is our belief that the **City Emergency Management and Disaster Preparedness Program is seriously out of compliance with the Americans with Disabilities Act of 1990 (Title II), The Rehabilitation Act of 1973**, as amended, Section 504, and the President's New Freedom Initiative."

The memorandum adds that "there appears to be continued resistance and a lack of responsiveness" to DoD's recommendations which "are often overlooked and not included in reports unless DoD staff are actually present at meetings and bring attention to the issues." In this memorandum, the DoD requested, among other things, that the City (1) survey all shelters, warming centers, cooling centers, relocation sites, evacuation assistance centers, etc, for accessibility pursuant to the Department of Justice (DOJ) Checklist; (2) establish a Memorandum of Understanding (MOU) with the Los Angeles Chapter of the American Red Cross (ARC) to address the provision of reasonable accommodation and personal assistants during emergencies; (3) evaluate all emergency plans to ensure that the needs of people with disabilities have been adequately addressed and (4) integrate people with disabilities, disability service providers, and advocacy organizations into the planning process. The City has not adopted any one of these recommendations. Accordingly, the DoD's conclusion that the City's emergency preparedness program does not comply with federal disability laws remains true today.

        (c)     The City Regularly Assesses the Efficacy of Its Plans But Does Not Assess their Effectiveness for Persons with Disabilities.

The City assesses the efficacy of its emergency plans for the general population on an ongoing basis. Indeed whenever the City's emergency operations center is activated, there must be an after-action report. Also, in the past two years, there has been a systematic review of the City's emergency preparedness program.

Experts agree that, because of the unique needs of persons with disabilities, assessing the efficacy of a city's emergency plans requires regularly evaluating such plans' effectiveness with regard to people with disabilities. However, the City has not

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

assessed the effectiveness of its plans with respect to disabled persons.  There has been no systematic study of the extent to which the City's emergency plans adequately or do not adequately serve the needs of people with disabilities.  Moreover, there has been no assessment as to whether the Fire Department, Police Department or the City as a whole has the capacity to respond to the emergency needs of persons with disabilities.  There has been no organized investigation of past disasters in the Los Angeles area to see how the City's emergency program worked for disabled residents.  As such, the City does not know one way or the other whether in past disasters in Los Angeles the City's emergency preparedness program adequately served persons with disabilities.  There is no requirement in the City's emergency preparedness program for a performance evaluation of the program as to persons with disabilities.  Nor is any effort underway to assess the City's emergency preparedness program as to the needs of disabled people.

      (d)      **Although the City Identifies the Needs of and Resources for Its Residents During an Emergency, It Fails to Do So for Persons with Disabilities.**

The City has identified in advance both needs and resources for the general public during an emergency and has a written plan which details the processes by which such needs are to be addressed by the existing resources.  In 2008, the City began development of a resource inventory database known as Emergency Asset Resource Net.  The City also calculates the number of shelter beds that may be required in an emergency.

Experts agree that because of the unique needs of persons with disabilities, advance planning is particularly important.  Through such advance planning, a city must identify its shelter and transportation capacities for persons with disabilities and must stockpile medications and equipment needed by disabled people.  A city must also attempt to identify where persons with disabilities may be located during an emergency and must set up arrangements with disability community organizations to explicitly define their roles during an emergency.

However, the City has totally failed to identify either the needs of or the resources

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

for persons with disabilities during an emergency.  Most fundamentally, the City does not identify those who may have unique needs in an emergency due to their disability.  The City has not identified where persons with disabilities live for purposes of responding to emergencies.  The City also has not identified concentrations of persons with disabilities. Nor has the City identified where persons who are In Home Support Services recipients (i.e. persons who require caregivers) are located.  Even first responders, such as the Police and Fire Department, do not know where persons with disabilities may be located during an emergency.

In addition, the City has not conducted any inventory of its accessible buses to match against the emergency needs of persons with disabilities.  Nor has the City inventoried the Police Department's accessible vehicles or the Fire Department's emergency equipment designed for persons with disabilities to determine whether there would be an adequate supply in an emergency.  In addition, the City knows neither its overall capacity of accessible shelter space nor the number of accessible spaces it would need.  The City has not stockpiled medications that persons with disabilities might need and has not stockpiled wheelchairs or other assistive devices.

Finally, the City has failed to reach out to disability community organizations through memorandums of understanding or other arrangements to help identify persons with disabilities or to assist the City in meeting such persons' emergency needs.

       (e)    **The City Has Plans to Notify Its Residents of an Emergency But Has Failed to Plan for Notifying Persons with Disabilities.**

The City's emergency preparedness program includes provisions to notify residents of an emergency.  Notifications may occur through the media.  In addition, the Police Department is charged with the responsibility of notifying the public in an emergency, typically.  These notifications are made through bullhorns or loudspeakers on police vehicles or in some cases door-to-door.  To the extent that the Fire Department would have to make any notifications, it would use a public address system.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

Experts agree that emergency notifications must be accessible to persons with sensory and cognitive disabilities.  However, there is no provision in the City's plans for how to notify persons with disabilities in an emergency.[4]  The City's emergency plans do not provide for any specific notification to persons who are deaf.  Moreover, the emergency alert system on TV does not have audio to assist persons who are blind.  Nor do the City emergency plans explain how information would be communicated to persons with cognitive disabilities.  In sum, the City has no way to ensure that notifications about emergencies will reach disabled persons.

> (f)   Although the City Expects Residents to Shelter in Place, It Provides No Assistance to Persons with Disabilities to Do So.

During an emergency, the City assumes that based on the resources it has and the severity of the disaster, it may be some period of time before the City can respond.  The City admits that residents may have to take care of themselves wherever they are (e.g., their homes) for 3 to 7 days before they can expect any City support.  Experts agree that sheltering in place for 72 hours or more may be impossible for people with disabilities, in part, because of the unique needs of persons with disabilities, namely their disproportionate dependence on electricity, medications and caregivers.  However, the City has no plans to provide support for persons with disabilities during the first 72 hours after an emergency.  There are no plans to provide necessary medications or electrical power to persons with disabilities who may need either.[5]  Nor does the City have any plans for how it will locate persons with disabilities during a disaster.

> (g)   In Providing Evacuation and Transportation to Shelters, the City Does Not Address the Needs of Persons with Disabilities.

---

[4] To the extent that the EMD, Fire Department or Police Department intend to rely on notifications via their websites, the City admits that their websites are not accessible to persons with disabilities.

[5] The Fire Department may, in limited situations, provide medical services when persons with disabilities shelter in place.  However, the Fire Department has no protocol for providing support to persons with disabilities who are sheltering in place and maintains that it is not their responsibility.  The Fire Department also admits that the 911 system may become overwhelmed, making it difficult for persons with disabilities to seek assistance.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

The City's emergency preparedness program includes efforts to assist individuals in evacuating to shelters or gathering points.  The Police Department is in charge of developing a plan for and initiating evacuations but is not responsible for "physical extrication" and instead would call the Fire Department.  The Fire Department conducts search and rescue for individuals that may be unable to evacuate themselves.  In addition, the City has the ability to work with MTA to access buses to relocate persons from emergency areas to shelters or evacuation centers.

Experts agree that, because of their unique needs, disabled persons may require individual evacuation assistance not only when they are trapped in their homes but also if they cannot negotiate stairs and elevators are not working, if they cannot get into their wheelchairs without assistance or their mobility equipment has been damaged by the emergency, or if there is debris in their path of travel making it impossible for them to navigate.  Additionally, any transportation used in an evacuation must be accessible.

Yet the City has no plans for evacuating persons with disabilities.[6]  The City has no written plans for whether caregivers and medical equipment (e.g., wheelchairs, respirators) will be evacuated with persons with disabilities, for how to address the needs of persons who have been evacuated without their assistive devices or for what happens with service animals during an evacuation.  Furthermore, the City has no plans for accessible transportation during evacuations.  Indeed, the City has not identified the number of persons who may need accessible transportation in an emergency and there has been no study to determine whether MTA buses, which can accommodate two wheelchairs per bus, will be sufficient to meet the needs of persons with disabilities.

        (h)    The City's Mass Evacuation Plans Include No Provisions to Meet the Needs of Persons with Disabilities.

The City plans for mass evacuation.  Currently in draft form, the plan provides

---

[6] For instance, the Police Department is in charge of evacuations of disabled persons but has no protocol for evacuating someone who is quadriplegic.  Instead it would seek help from the Fire Department in evacuating such a person.  However, the Fire Department also has no protocol for evacuating someone who is quadriplegic.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

general provisions for evacuating persons from the City or an entire area within the City. In the meantime, the City's current mass evacuation plan consists of designating potential routes and leaving it up to individuals to evacuate themselves. Experts agree that a city must provide accessible transportation during a mass evacuation because due to their unique needs, persons with disabilities are less likely to drive a vehicle and thus, will rely on the City to evacuate them. However, the City has no plans for assisting persons with disabilities during a mass evacuation; nor does the City seem interested in remedying this problem, as its draft mass evacuation plan includes no disability-specific provisions.

> (i)   The City's Plans For Temporary Housing Do Not Address Accessible Temporary Housing.

The City's emergency preparedness program includes providing temporary housing after an emergency. The City provides for such temporary housing in its Recovery and Reconstruction Plan, which includes establishing tent cities, identifying large group housing and utilizing hotels. Experts agree that temporary housing provided by a city must be accessible to persons with disabilities. However, the City has no plan for providing accessible temporary housing.

> (j)   The City's Recovery Plan Fails to Provide Any Assistance to Persons With Disabilities After an Emergency.

During the recovery phase, the City has plans to assist residents in remediating damage. Experts agree that because of their unique needs, persons with disabilities will require specific assistance during the recovery phase, such as assistance returning to their homes and assistance restoring accessible features in their homes and neighborhoods. However, the City has no written plans that provide for addressing the needs of persons with disabilities in the recovery phase after a disaster. The City has no plan to provide persons with disabilities assistance in returning to their homes or to check in with persons with disabilities to see if they are safe. The City also has no plan to assist persons with disabilities in repairing their homes or to help fix accessibility features. The City also has not included disability community groups in planning for recovery.

b.   **The City Denies Meaningful Access By Failing to Provide Reasonable Accommodations for Its Emergency Preparedess Program.**

(1)   **The City Must Provide Reasonable Accommodations to Persons with Disabilities Independent of What It Offers Non-Disabled Persons.**

Under both the ADA and Section 504, discrimination also can occur if a public entity fails to make reasonable modifications.[7] 28 C.F.R. § 35.130(b)(7); *see also McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004)(ADA); *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002)(Section 504).  Some courts have treated reasonable accommodations as a second step in the meaningful access analysis, finding that where persons with disabilities are uniquely burdened, reasonable accommodations must follow in order to ensure meaningful access. *See Crowder*, 81 F.3d at 1485.  As discussed above, persons with disabilities have unique needs in accessing the City's emergency preparedness program, and the City has ignored those needs.  In so doing, the City has failed to provide reasonable accommodations, thus further violating the law.

Courts have also held that a failure to provide reasonable accommodations can be a stand-alone claim, itself a denial of meaningful access. *See Alexander*, 469 U.S. at 301. Failure to provide a reasonable accommodation is actionable under the ADA because it "not only protects against disparate treatment, it also creates an affirmative duty in some circumstances to provide special, preferred treatment, or 'reasonable accommodation.'" *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F. Supp. 962, 965 (N.D.Cal. 1998); *see also Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134, 1136 (N.D.Cal. 1998)("[i]n the context of disability…equal treatment may not beget equality.").

The reasonable accommodation analysis is not based on a comparative approach. In *McGary v. City of Portland*, the Ninth Circuit held that "[a] plaintiff need not allege either disparate treatment or disparate impact in order to state a reasonable

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

---

[7] Although Title II of the ADA uses the term "reasonable modification," rather than "reasonable accommodation," these terms create identical standards. *See Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 n. 26 (9th Cir. 1999). Thus, these terms are used interchangeably.

accommodation claim." *McGary*, 386 F.3d at 1266; *see also Henrietta D.*, 331 F.3d at 276-77 (2d Cir. 2003).  Citing to the Supreme Court's holding in *Olmstead*, the Ninth Circuit explained that a reasonable accommodation claim need not include a "comparison class" that was treated differently. *McGary*, 386 F.3d at 1266 (*citing Olmstead v. Zimring*, 527 U.S. 581, 598 (1999)).  Specifically, the Ninth Circuit found that Portland discriminated against McGary by failing to reasonably accommodate his disability when it refused to grant him additional time to comply with a nuisance abatement ordinance. The *McGary* Court rejected the district court's finding that in order for McGary to allege that he was discriminated against because of his disability, he must demonstrate that a non-disabled neighbor also in violation of the ordinance was given an extension of time. Rather a plaintiff must demonstrate that, without reasonable accommodation, he would not be able to access the benefits from the program because of his disability.  That is, "accommodations are necessary to level the playing field." *McGary*, 386 F.3d at 1267.

### (2)   The Evidence Demonstrates that Reasonable Accommodations May Require Providing Assistance Not Offered to Non-Disabled Persons.

Plaintiffs submit that meaningful access has been denied pursuant to the *Crowder* and *Rodde* analyses alone.  The evidence demonstrates that the City provides the ten essential components of its emergency preparedness program to the general public; that persons with disabilities have unique needs; and that the City ignores those unique needs, disproportionately burdening Plaintiffs.

However, based on the *McGary* analysis, meaningful access can be denied even in instances where the City may argue that it does not offer assistance to the general public. Under *McGary*, Plaintiffs need not demonstrate that the City is offering particular components of its emergency preparedness program to non-disabled persons and thus must offer the same benefits to persons with disabilities.  Rather Plaintiffs need only demonstrate that the City is failing to provide reasonable accommodations, making it difficult or impossible for persons with disabilities to access the benefits of the program.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

For example, even if the City does not plan to provide assistance for other residents when they are sheltering in place, the City has an obligation under the reasonable accommodation theory to make such plans for persons with disabilities because without reasonable accommodations, persons with disabilities would not be able to benefit from the City's emergency preparedness program.  Persons with disabilities would not have the same chance of survival when sheltering in place as non-disabled persons (e.g., someone on a respirator could not breathe without electricity).  However, as the evidence above shows, the City makes no plans for assisting persons with disabilities while sheltering in place.  As a result, such persons would not be able to benefit from other components of the program, such as evacuation, shelters, temporary housing and recovery efforts and thus, would be denied meaningful access.

Similarly, even if the City does not plan to offer assistance in mass evacuations, the City has an obligation under the reasonable accommodation theory to make plans to provide such assistance to persons with disabilities because without reasonable accommodations, persons with disabilities would not be able to benefit from the City's emergency preparedness program.  The disabilities of some persons may prohibit them from driving (e.g., vision disabilities, mobility disabilities) and may prevent them from being able to evacuate from the area without assistance.  However, as the evidence discussed above demonstrates, the City does not plan to assist persons with disabilities during mass evacuations.  Thus, such persons would not be able to benefit from other components of the City's emergency preparedness program such as shelters and temporary housing and thus, would be denied meaningful access.

### 4. The Discrimination Against Persons with Disabilities Is by Reason of their Disabilities.

To prove a claim under both the ADA and Section 504, Plaintiffs must demonstrate that the discrimination alleged above was by reason of disability. *Weinreich*, 114 F.3d at 978.  The disproportionate burden that the City places on persons with disabilities is by reason of their disabilities.  The disproportionate burden is due to a

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

lessening of benefits caused by the City ignoring the unique needs of persons with disabilities.  These unique needs result from a person's disability.  For instance, persons with mobility disabilities cannot climb stairs (when elevators are not working) while non-disabled persons can.  Persons with mobility disabilities may not be able to navigate where paths of travel (e.g., sidewalks, roads) are filled with debris (e.g., rubble, broken pavement, downed tree branches) while non-disabled persons can step or climb over such barriers.  Persons with vision disabilities may not be able to safely evacuate to shelters because debris poses a tripping hazard and may cause them to be disoriented and unable to locate the shelter while non-disabled persons do not face such additional barriers.  These unique needs due to disability that arise during emergencies must be addressed prior to an emergency in the City's emergency plans.  The evidence above demonstrates that the City is failing to do this and thus, is discriminating by reason of disability.

Similarly, the City's failure to provide reasonable accommodations makes it more difficult or even impossible for persons with disabilities to access the benefits of the City's emergency preparedness program.  This difficulty or impossibility is by reason of disability.  For instance, some persons cannot benefit from the City's shelter and care planning where, because of their disabilities, they cannot physically enter and navigate a shelter.  Likewise, some persons with disabilities cannot benefit from other components of the City's emergency preparedness program, because due to their disabilities, they are less likely to survive without City assistance.  In particular, persons who rely on respirators cannot survive during a power outage without assistance from the City and persons whose disabilities prevent them from driving cannot evacuate to safety without assistance from the City.  Though reasonable accommodations are needed by disabled persons to provide access to the benefits of the City's emergency preparedness program, the evidence above shows that the City fails to provide these accommodations and thus, discriminates by reason of disability.

//

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

### 5.    The City Is a Public Entity and a Recipient of Federal Funds.

In its Answer, the City admits that it is both a public entity and recipient of federal funds.  As such, the City is subject to both the ADA and Section 504.

### C.    The City Has Violated California Government Code § 11135.

### 1.    Elements of a Section 11135 Claim

California Government Code § 11135 provides that "[n]o person in the state of California shall, on the basis of…disability, be unlawfully denied full and equal access to the benefits of…any program or activity that receives any financial assistance from the state." Cal. Gov. Code § 11135(a).  Thus the elements of a claim are: (1) Plaintiffs are persons in the state of California; (2) Defendants have unlawfully denied Plaintiffs full and equal access to the benefits of a program or activity; and (3) the program or activity receives financial assistance from the state.

In addition, courts have held that "California Government Code § 11135 is identical to the Rehabilitation Act except that the entity must receive State financial assistance rather than Federal financial assistance." *D.K. ex rel. G.M. v. Solano County Office of Educ.*, 667 F. Supp.2d 1184, 1191 (E.D.Cal. 2009); *see also Williams v. Grannis*, 2010 WL 1405669 *7 n. 3 (E.D.Cal. 2010).  Thus, if there is a violation of Section 504 and the public entity receives state funding, then there has been a violation of Section 11135.  Further, Section 11135 incorporates the protections and prohibitions of the ADA and its implementing regulations. Cal. Gov. Code § 11135(b).  Thus, a violation of the ADA or any of its implementing regulations is a violation of Section 11135.

### 2.    Plaintiffs Have Met All The Elements of a Section 11135 Claim.

The Named Plaintiffs and the Plaintiff Class are or represent persons in the state of California since Plaintiff Harthorn is a resident of the City of Los Angeles, CALIF has constituents who are residents of the City of Los Angeles and the class is limited to all persons with disabilities…who are within the City of Los Angeles…"  The City has unlawfully denied full and equal access based on disability to its emergency preparedness

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

program.  Based on the evidence discussed above, for each component of its emergency preparedness program, persons with disabilities do not have full and equal access.  Rather their access is less than that of non-disabled persons whose needs are addressed by the City's emergency preparedness program.  Finally, the City receives state funding for its emergency preparedness program.  Moreover, as discussed above, the City has violated both Section 504 and Title II of the ADA and thus, Plaintiffs have established a violation of Section 11135 by meeting the elements set forth above for the ADA and 504 claims.

### D. The City Has Violated California Civil Code § 54

#### 1. Elements of a DPA Claim

The California Disabled Persons Act ("DPA"), Cal. Civil Code §§ 54 *et seq*., provides that "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public…to places to which the general public is invited." Cal. Civ. Code § 54.1(a)(1).  This includes all "public conveyances or modes of transportation (whether private, public or franchised, licensed, contracted or otherwise provided)" and "lodging places." *Id*.  Thus, the elements of a DPA claim are: (1) Plaintiffs are individuals with disabilities; (2) Defendants own or operate places to which the general public is invited; and (3) Defendants are failing to provide Plaintiffs with the same full and equal access to such places as is provided to the general public.

Further, the DPA explicitly states, and courts have recognized, that a violation of the rights of an individual under the ADA is a per se violation of the DPA. *See* Cal. Civ. Code § 54(c); *see also Hubbard v. SoBreck*, 554 F.3d 742, 745 (9th Cir. 2009).

#### 2. Plaintiffs Have Met All The Elements of a DPA Claim.

Here again, the evidence demonstrates that Named Plaintiffs and the Plaintiff class are or represent individuals with disabilities.  All have physical or mental conditions which limit a major life activity. *See* Cal. Gov. Code § 12926.  The evidence discussed above demonstrates that the City owns or operates (1) "public conveyances or modes of transportation (whether private, public or franchised, licensed, contracted or otherwise

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

provided)" to transport persons during emergencies and (2) "lodging places," namely shelters and temporary housing during emergencies.  For both of these, the evidence discussed above demonstrates that the City has not provided the same full and equal access to such places as is provided to the general public.[8]  Further, as discuss above, the City has violated Title II of the ADA and thus, Plaintiffs have established a violation of the DPA by meeting the elements set forth above for the ADA and 504 claims.

### E.   Defenses Asserted by the City Are Without Merit.

#### 1.   The City Has Relied On Several Defenses in this Action.

In its Answer, the City alleged 29 affirmative defenses.  However, during the meeting between counsel pursuant to Rule 16-2 on December 6, 2010, opposing counsel noted his intent to rely on the defenses used in the City's opposition to Plaintiffs' motion for summary judgment.  Those are discussed below.

#### 2.   There is No Evidence that Providing Greater Specificity in City Emergency Plans Constitutes a Fundamental Alteration.

The City may assert the fundamental alteration defense.  To demonstrate a fundamental alteration, a defendant must show that the modifications would "compromise the essential nature of the program." *Alexander*, 469 U.S. at 300; *see also Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (modifications would fundamentally alter the nature of the service provided); *Dadian v. Village of Wilmette*, 269 F.3d 831, 839 (7th Cir. 2001) (modification would be "at odds with the purposes behind the rule").  The City has failed to do this.  The City has not explained what the essential nature of its emergency preparedness program is or how this would be fundamentally altered by including specific provisions addressing the needs of disabled persons.  The City has so far offered only the unsupported testimony of Eric Baumgardner in support of its theory that specificity in emergency planning is undesirable.  The City thus has not met its

---

[8] Some courts have extended the DPA analysis beyond architectural barriers at places to which the public is invited to include programs as well.  In which case, the entire emergency preparedness program would be covered by the DPA. *See Hankins v. El Torito Restaurants, Inc.*, 63 Cal.App.4th 510, 523 (1998).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

burden to establish this defense.  In contrast, Plaintiffs have evidence from two of the nation's leading experts explaining why additional detail is desirable, necessary and consistent with federal guidelines regarding emergency preparedness.  Further, Plaintiffs can point to other jurisdictions' emergency plans that provide the necessary detail without fundamentally altering the essential nature of their plans.

### 3.    Personal Preparedness Is Not an Affirmative Defense.

The City may argue that onus of emergency preparedness belongs with the disabled persons who must personally prepare for emergencies.  However, personal preparedness is not an affirmative defense.  It plays no part in the substantive law governing this case, namely the ADA and Section 504.  Under these laws, discrimination stems from a denial of meaningful access to a program, service or activity.  Courts have interpreted "program, service or activity" to include "anything a public entity does." *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001)(*quoting Yeskey v. Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997), *aff'd*, 524 U.S. 206 (1998)); *see also Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731 (9th Cir. 1999)(defining "program, service or activity" as "a normal function of a governmental entity").  Personal preparedness is not something a public entity does; it is based on the actions of an individual.  Thus, whether a person, disabled or not, is personally prepared for an emergency is irrelevant to whether a public entity provides meaningful access.

### 4.    Providing Individual Accommodations After an Emergency Occurs Is Not a Defense to Plaintiffs' Claims of Discrimination.

The City may argue that it has provided reasonable accommodations to individuals when requested in responding to emergencies.  This is not a defense to Plaintiffs' claims.  Plaintiffs' claims of discrimination do not concern individualized reasonable accommodations after disaster strikes but rather reasonable accommodations provided in preparation for (i.e. prior to) an emergency.  Plaintiffs do not want individual persons with disabilities calling 9-1-1 after a disaster requesting, for instance, electricity to power their wheelchair while sheltering in place.  Rather, Plaintiffs seek such accommodations

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

1  ahead of time so that the City plans will have already incorporated the provision of such
2  accommodations.  Thus, for example, assistance to disabled persons who are sheltering in
3  place after an emergency would be a part of the emergency preparedness program, not
4  something to request after the emergency.  The City's emergency preparedness program,
5  however, does not provide such reasonable accommodations for its program.

       **5.     The "Viewed In Its Entirety" Standard Is Inapplicable.**

7          The City may argue that its emergency preparedness program need only be
8  accessible when viewed in its entirety.  However, the "viewed in its entirety" legal
9  standard applies to physical access for existing facilities. 28 C.F.R. § 35.150.  Plaintiffs
10 do not base their claims on this regulation.  Rather, Plaintiffs' claims are based on the
11 ADA, Section 504 and the reasonable accommodation regulation.

**III.    ADDITIONAL ISSUES**

       **A.     Evidentiary Issues and Issues of Law**

14         All evidentiary issues to date have been raised in Plaintiffs' motions in limine.
15 There are no outstanding issues of law.

       **B.     Bifurcation of Issues**

17         Plaintiffs do not seek bifurcation of issues at trial and request that the Court
18 determine both liability and remedy.  Plaintiffs are willing, if the Court so chooses, to
19 meet and confer with the City and return to the Court with a proposal for remedial relief.

       **C.     Jury Trial**

21         Plaintiffs request a bench trial.

       **D.     Attorneys' Fees**

23         Plaintiffs will be seeking attorneys' fees and, at the appropriate time, will move the
24 Court for an award of attorneys' fees.

       **E.     Abandonment**

26         Plaintiffs have not abandoned any issues identified in their complaint.

27         //

28         //

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204

1  DATED: January 14, 2011                    Respectfully submitted,

2                                             DISABILITY RIGHTS ADVOCATES

3                                             DISABILITY RIGHTS LEGAL CENTER

4

5                                             _____/s/_____

6                                             Mary-Lee K. Smith
                                              Attorneys for Plaintiffs

7

8
   \\Server\cases\CALIF.LA\Trial\Memo_Fact_Law_FINAL.doc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204