1
2
3
4
5
6
7

NO JS-6
FILED
CLERK, U.S. DISTRICT COURT

FEB 1 0 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

8          UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10

11

COMMUNITIES ACTIVELY
LIVING INDEPENDENT AND
FREE, ET AL.

          Petitioner,

v.

CITY OF LOS ANGELES, ET AL.

          Respondents.

No. CV 09-0287 CBM (RZx)

ORDER:
(1) GRANTING PLAINTIFFS'
    MOTION FOR SUMMARY
    AJUDICATION ON LIABILITY;
(2) GRANTING IN PART
    PLAINTIFFS' MOTION TO
    STRIKE;
(3) GRANTING PLAINTIFFS'
    REQUEST FOR JUDICIAL
    NOTICE
(4) SUSTAINING PLAINTIFFS'
    OBJECTION; AND
(5) OVERRULING DEFENDANT
    CITY OF LOS ANGELES'
    OBJECTIONS

There are four matters pending before the Court: (1) Plaintiffs Communities

Actively Living Independent and Free's ("CALIF") and Audrey Harthorn's

("Harthorn") (collectively, "Plaintiffs") Motion for Summary Judgment against

Defendant City of Los Angeles ("the City"), [Doc. No. 93]; (2) Plaintiffs' Motion

to Strike five declarations filed by the City in opposition to Plaintiffs' Motion for

1

1   Summary Judgment, [Doc. No. 98-6]; (3) Plaintiffs' Objection to Reply

2   Declaration of Angela Kaufman, [Doc. No. 106]; and (4) the City's Objections to

3   Evidence Submitted by Plaintiffs in Support of Their Motion for Summary

4   Judgment. [Doc. No. 97-12.]

5   **JURISDICTION**

6   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1334, and 1367.

7   **FACTUAL AND PROCEDURAL BACKGROUND**

8   On January 14, 2009, Plaintiffs filed the complaint in this action against the

9   City and Defendant County of Los Angeles ("the County") (collectively,

10  "Defendants") alleging four causes of action: (1) violation of Title II of the

11  Americans with Disabilities Act ("ADA"); (2) violation of Section 504 of the

12  Rehabilitation Act of 1973 ("Section 504"); (3) violation of the California

13  Disabled Persons Act ("CDPA"), California Civil Code § 54, *et seq.*; and (4)

14  violation of California Government Code § 11153.[1] [Doc. No. 1.] The dispute

15  concerns whether Defendants' emergency preparedness programs adequately

16  serve the needs of the more than 800,000 individuals with disabilities who live

17  within the jurisdiction of the City. (Plaintiffs' Memorandum of Points and

18  Authorities in Support of Motion for Summary Judgment ("Pls.' Mem. re Mot. for

19  Summary Judgment") at 2:13-15, 4:1-2; Plaintiffs' Response to Defendants'

20  Statement of Genuine Issues ("SGI") at ¶ 25.[2]) Plaintiffs contend that these

21  individuals suffer discrimination as a result of their disabilities because

22  Defendants' emergency preparedness programs fail to address their unique needs.

23  (Pls.' Mot. for Summary Judgment at 2:13-15, 17:21-23.) Due to their exclusion

24  from such programs, Plaintiffs further maintain that they are disproportionately

25  _____

26  [1] On April 13, 2010, the Court signed the parties' Stipulation Approving Certification of a Class. [Doc. No. 81.]
    The class is comprised of all people with disabilities, as defined by the ADA, who are within the City and the

27  jurisdiction served by Defendants' emergency preparedness programs and services. (Order Approving Certification
    of a Class at 1:4-9.)

28  [2] The Court refers only to the Plaintiffs' Response to Defendants' Statement of Genuine Issues when the referenced
    fact is undisputed by the parties.

1   vulnerable in the event of an emergency.  (*Id.* at 2:12-13.)

2         On June 7, 2010, the Court approved a stipulation filed by Plaintiffs and the

3   County, which requested a stay of action in consideration of an agreement

4   between Plaintiffs and the County to develop an Access and Functional Needs

5   Annex to address the needs of individuals with disabilities with respect to the

6   County's emergency preparedness and planning.  [Doc. No. 88.]  Therefore,

7   Plaintiffs' Motion for Summary Judgment is brought solely against the City.

8         Effective emergency preparedness plans must include the following

9   essential components: (1) development of a comprehensive emergency plan,

10  (Declaration of Michael C. Collins, Plaintiffs' Expert, ("Collins Decl.") at ¶ 11(a);

11  Deposition of Steve Dargan, Liaison between the County's Department of Public

12  Health's Emergency Preparedness and Response Program and the City's

13  Emergency Management Department, ("Dargan Dep.") at 38:10-13; SGI at ¶ 2);

14  (2) assessment of the efficacy of the emergency plan, (Collins Decl. at ¶ 11(b);

15  Dargan Dep. at 38:14-18); (3) advance identification of needs and resources,

16  (Collins Decl. at ¶ 11(c); Dargan Dep. at 38:19-22); (4) provision of public

17  notification and communication, (Collins Decl. at ¶ 11(d); Dargan Dep. at 38:23-

18  39:1; Deposition of Keith Garcia, the City's Emergency Coordinator I, ("Garcia

19  Dep.") at 33:23-34:1; Deposition of Andrew Neiman, Lieutenant with the Los

20  Angeles Police Department, ("Neiman Dep.") at 51:22-52:1; Deposition of Anna

21  Burton, Assistant General Manager of the City's Emergency Management

22  Department, ("Burton Dep.") at 18:12-14); (5) provision of policies or procedures

23  concerning the concept of sheltering in place, (Collins Decl. at ¶ 11(e); Dargan

24  Dep. at 39:2-5; Declaration of Robert Freeman, Chief of the Operations Division

25  of the City's Emergency Management Department, ("Freeman Decl.") at ¶ 10); (6)

26  provision of shelter and care for individuals forced to evacuate their homes,

27  (Collins Decl. at ¶ 11(g); Dargan Dep. at 39:10-13; Garcia Dep. at 34:12-15;

28  Neiman Dep. at 51:14-21; Burton Dep. at 18:9-11, 19:1-4); (7) provision of

1    assistance with evacuation and transportation, (Collins Decl. at ¶ 11(f); Dargan

2    Dep. at 39:14-17; Garcia Dep. at 34:2-11, 34:16-20; Neiman Dep. at 52:2-6;

3    Burton Dep. at 17:25-18:8); (8) provision of temporary housing, (Collins Decl. at

4    ¶ 11(h); Dargan Dep. at 39:24-40:2; Burton Dep. at 18:15-18); and (9) provision

5    of assistance in recovery and remediation efforts after an emergency or disaster.

6    (Collins Decl. at ¶ 11(i); Dargan Dep. at 40:3-7; Garcia Dep. at 34:21-25.)

7         The City's emergency preparedness program – which consists of a 200-plus

8    page Emergency Operations Plan, twenty-one (21) incident-specific annexes, an

9    Emergency Operations Board, and an Emergency Management Committee –

10   addresses "preparation, planning, response and recovery for the city in a disaster"

11   or other emergency. (SGI at ¶¶ 35, 37, 39-40; Burton Dep. at 11:22-12:4, 24:4-10;

12   Deposition of James Featherstone, General Manager of the City's Emergency

13   Management Department, ("Featherstone Dep.") at 34:20-35:3.) Such

14   emergencies include earthquakes, wildfires, flooding, landslides, and terrorist

15   attacks. (SGI at ¶ 33.) According to the City's Chief of the Operations Division

16   of the Emergency Management Department ("EMD"), the City's emergency plans

17   "are designed to save lives, protect property and return the City to normal service

18   levels" by "assist[ing] in the response and recovery efforts following a disaster."

19   (Freeman Decl. at ¶¶ 4, 5.)

20        Although the City's emergency preparedness program requires coordination

21   from numerous departments, (id. at ¶ 6), California's state emergency plan and

22   Standardized Emergency Management System place the City at the first level of

23   response for meeting the disaster needs of its residents in the event of an

24   emergency. (Burton Dep. at 128:15-21, 129:2-5; Garcia Dep. at 71:7-15.)

25   Despite the fact that individuals with disabilities have special needs and may

26   require reasonable accommodations during an emergency, the City's emergency

27   preparedness program does not include provisions to notify people with auditory

28   impairments or cognitive disabilities of an emergency, or evacuate, transport, or

1    temporarily house individuals with disabilities during or immediately following an

2    emergency or disaster.  (Burton Dep. at 41:9-42:1, 44:5-8, 44:16-45:4, 52:18-22,

3    54:11-15, 127:5-13; Garcia Dep. at 36:1-4, 36:23-37:13, 41:8-12[3], 42:15-19, 55:8-

4    56:1; Deposition of Robert Freeman, Chief of the Operations Division of the

5    City's EMD, ("Freeman Dep.") at 27:7-28:2, 56:21-25, 57:3-7, 78:8-12;

6    Featherstone Dep. at 20:15-18, 67:21-25, 68:16-71:11; Deposition of Angela

7    Marie Kaufman, ADA Compliance Coordinator with the Department on

8    Disability, dated July 22, 2010 ("Kaufman Dep.") at 129:12-19, 131:19-22, 132:2-

9    6.)  Although the City's employees testified that such responsibilities are

10   delegated to specific departments, such as the Los Angeles Fire Department

11   ("LAFD"), the Los Angeles Police Department ("LAPD"), and the Department of

12   Parks and Recreation, (Freeman Dep. at 15:14-23, 28:18-29:4; Declaration of

13   James Featherstone, General Manager of the City's EMD, ("Featherstone Decl.")

14   at ¶ 18), there is no evidence in the record of any City documents explaining how

15   these departments shall assist individuals with disabilities during an emergency or

16   disaster.  (Freeman Dep. at 30:3-7, 61:7-25; Neiman Dep. at 32:17-33:2.)  The

17   individual departments which have been delegated the responsibility of assisting

18   such individuals similarly have no plans for addressing the needs of individuals

19   with disabilities in the event of an emergency or disaster.  (Freeman Dep. at 72:11-

20   14; Neiman Dep. at 32:12-16, 54:23-55:17, 59:18-60:16; Deposition of Stacy

21   Gerlich, Captain with the LAFD, ("Gerlich Dep.") at 23:15-22, 38:11-15, 39:9-

22   18.)  Indeed, the departments have not assessed whether they have the "capacity to

23   respond to the needs of people with disabilities during a disaster" or emergency.

24   (Neiman Dep. at 31:22-32:3; Gerlich Dep. at 34:15-20.)  The City has likewise not

25   done a study of whether it has "the resources or capacity to respond to the needs of

26   people with disabilities in an emergency."  (Kaufman Dep. at 188:24-189:4.)

27   _____

28   [3] Garcia, however, testified that the City can request buses that are accessible for people with disabilities.  (Garcia Dep. at 37:3-9.)

In 2008, the City's Department on Disability ("DOD") reported that the City's emergency preparedness program "is seriously out of compliance" with the ADA and Section 504 and the City's residents with disabilities "will continue to be at-risk for suffering and death in disproportionate numbers unless the City family drastically enhances the existing disability-related emergency management and disaster planning process and readiness as required by the ADA and other statutes." (Declaration of Mary-Lee Smith, Plaintiffs' Counsel, ("Smith Decl.") at ¶ 14, Ex. L (Memorandum from the DOD to the City's EMD (Aug. 27, 2009).) The DOD issued numerous recommendations, including, but not limited to, the following: (1) The City should conduct a survey of all shelters, warming centers, cooling centers, relocation sites, and evacuation assistance centers, for accessibility pursuant to the U.S. Department of Justice's ADA Checklist for Emergency Shelters; (2) the City should establish a Memorandum of Understanding with the Los Angeles Chapter of the American Red Cross to outline and address the provision of reasonable accommodations and personal assistants during activations; (3) the City should forward certain information regarding an Alert and Notification System, if one is purchased, to the DOD, including how the system provides functional equivalency to the disability community; and (4) the City should take other actions to ensure that all emergency plans meet the needs of people with disabilities and that such needs are communicated and understood by all of the City's relevant departments. (Smith Decl. at ¶ 14, Ex. L.) Other than surveying shelter sites, there is no evidence that the City has adopted any of the DOD's recommendations.[4] (Kaufman Dep. at 66:23-67:14, 69:19-70:10, 72:9-14; Featherstone Dep. at 21:19-23; Declaration of

---

[4] Two EMD employees report a new requirement to take an online Federal Emergency Management Agency course addressing persons with disabilities in emergencies as the only change made after the filing of this lawsuit. (SGI at ¶ 31; Garcia Dep. at 51:17-52:4; Featherstone Dep. at 49:6-50:9.) The City also indicated that the City's Oversight Committee has recommended the purchase of 5 portable lifts and 56 evacuation chairs but it is unclear whether the items have been purchased by the City. (Declaration of Angela M. Kaufman, ADA Compliance Coordinator with the DOD, ("Kaufman Decl.") at ¶ 25.)

1   Albert Torres ("Torres Dep.") at 20:7-25.)

2        With respect to shelter and care, specifically, the City, through the
3   Department of Parks and Recreation, has a responsibility to provide shelter to
4   residents displaced by an emergency. (Featherstone Dep. at 89:2-18; Torres Dep.
5   at 12:8-18.) The City, however, has conducted full disability compliance surveys
6   for only a fraction of its approximately 200 shelter sites. (Torres Dep. at 16:13-
7   16, 20:7-25, 47:12-18.) Of the surveyed sites, few – if any – of the shelters meet
8   all requirements mandated by the ADA. (*Id.* at 21:15-21.) The City maintains
9   that the American Red Cross is responsible for mass shelter and care along with
10  temporary housing, (Burton Dep. at 72:18-73:6, 73:25-74:5; Featherstone Dep. at
11  75:16-25, Garcia Dep. at 60:11-18; Gerlich Dep. at 18:16-21); however, there is
12  no agreement between the City and the American Red Cross setting forth any
13  specific responsibilities of the American Red Cross with respect to individuals
14  with disabilities. (Deposition of Michael Kleiner, Director of Emergency and
15  Disaster Response of the American Red Cross of Greater Los Angeles, ("Kleiner
16  Dep.") at 14:24-15:3, 24:16-25:10, 25:17-22.) Indeed, the Director of Emergency
17  and Disaster Response of the American Red Cross of Greater Los Angeles
18  testified that it is not his understanding that the American Red Cross is solely
19  responsible for shelter compliance with the ADA or accessibility of shelters for
20  individuals with disabilities. (*Id.* at 20:22-21:5.) The emergency preparedness
21  program has no provision addressing the inspection or evaluation of the American
22  Red Cross' policies and procedures at shelters. (Burton Dep. at 74:18-22.)

23       Plaintiffs filed the instant Motion for Summary Judgment on August 2,
24  2010. [Doc. No. 93.] An opposition and reply were filed thereto.[5] [Doc. Nos. 97,
25  98.] Along with its reply, Plaintiffs concurrently filed a Motion to Strike five of

26

27  [5] Plaintiffs' reply to the Motion for Summary Judgment and their reply to the Motion to Strike exceeded the ten-page limit prescribed by the Court's Standing Order. The parties are reminded that all papers must be filed in accordance with the Federal Rules of Civil Procedure, the Local Rules of this District, and the Court's Standing
28  Order. Future violations of these rules may result in the imposition of sanctions.

1   the nine declarations filed by the City in support of its opposition.[6] [Doc. No. 98-

2   6.] An opposition and reply were filed thereto. [Doc. Nos. 99, 103.] On October

3   7, 2010, a Statement of Interest of the United States in support of Plaintiffs'

4   Motion for Summary Judgment was filed with the Court. [Doc. No. 111.] The

5   Court heard oral argument from the parties. [Doc. No. 112.]

## PLAINTIFFS' MOTION TO STRIKE

7          Plaintiffs request that the Court strike five declarations submitted by the

8   City in opposition to Plaintiffs' Motion for Summary Judgment. Plaintiffs

9   contend that the subject declarations are deficient in one or more of the following

10  respects: (1) they introduce new witnesses and information not previously

11  disclosed by the City in violation of Federal Rule of Civil Procedure 26(a) and

12  26(e); (2) they clearly and unambiguously contradict prior deposition testimony of

13  the declarant(s); (3) they set forth opinions from witnesses lacking the requisite

14  qualifications to be experts; and/or (4) they reference material contained in written

15  documents without attaching such documents as required by Federal Rule of Civil

16  Procedure 56(e)(1). (Plaintiffs' Memorandum of Points and Authorities in

17  Support of Plaintiffs' Motion to Strike ("Pls.' Mem. re Mot. to Strike") at 1:9-21.)

18  **I. LEGAL STANDARD**

19         Federal Rule of Civil Procedure 26(a) requires that parties provide certain

20  initial disclosures. FED. R. CIV. P. 26(a). The parties must thereafter supplement

21  or correct discovery responses and disclosures as necessary. FED. R. CIV. P. 26(e).

22  "If a party fails to provide information or identify a witness as required by Rule

23  26(a) or (e), the party is not allowed to use that information or witness to supply

24  evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

25  justified or is harmless." FED. R. CIV. P. 37(c)(1); *see also Wong v. Regents of the*

26

27  [6] Plaintiffs' Motion to Strike was filed in violation of Local Rule 7-3, which requires that a conference of counsel take place at least ten (10) days prior to the filing of the motion. L.R. 7-3. Because the parties did meet and confer

28  prior to the filing of the motion, the Court concludes that judicial economy is best served by the Court's consideration of the Motion to Strike but cautions Plaintiffs' counsel that future violations may warrant sanctions.

1  *Univ. of Cal.*, 410 F.3d 1052, 1060 (9th Cir. 2005) ("Parties must understand that

2  they will pay a price for failure to comply strictly with scheduling and other

3  orders, and that failure to do so may properly support severe sanctions and

4  exclusions of evidence.").  The party facing sanctions bears the burden of

5  establishing that the delay was either substantially justified or harmless.  *Yeti by*

6  *Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106-07 (9th Cir. 2001).  In

7  determining whether a violation of a discovery deadline was substantially justified

8  or harmless, courts are guided by the following considerations: (1) prejudice or

9  surprise to the party against whom the evidence is offered; (2) the ability of that

10  party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad

11  faith or willfulness involved in not timely disclosing the evidence.  *Lanard Toys,*

12  *Ltd. v. Novelty, Inc.*, 375 Fed. Appx. 705, 713 (9th Cir. Apr. 13, 2010).  The Ninth

13  Circuit affords "particularly wide latitude to the district court's discretion to issue

14  sanctions under Rule 37(c)(1)."  *Yeti by Molly*, 259 F.3d at 1106.

15  **II. DISCUSSION**

16  **a. The Court Strikes Only Paragraph 14 of the Declaration of Eric**

17  **Baumgardner**

18  Baumgardner is an Emergency Preparedness Coordinator I with the City's

19  EMD assigned to the Operations Division, Planning Unit as the Planning Officer.

20  (Declaration of Eric Baumgardner, Emergency Preparedness Coordinator I with

21  the City's EMD, ("Baumgardner Decl.") at ¶ 2.)  The City designated

22  Baumgardner as one of its two experts on July 6, 2010.  (Declaration of Karla

23  Gilbride, Plaintiffs' Counsel, in Support of Plaintiffs' Motion to Strike

24  Declarations ("Gilbride Decl.") at ¶ 5, Ex. C.)  The designation did not provide

25  any information about the scope or substance of his testimony.[7]  (*Id.*)  Plaintiffs

26

[7] Baumgardner was not required to submit an expert report because he is a City employee who was not retained or compensated to testify in this action, and his duties do not routinely involve giving testimony. *See* FED. R. CIV. P. 26(a)(2)(B); *see also Armatis v. Owens-Brockway Glass Container, Inc.*, 2010 U.S. Dist. LEXIS 7995, *1-2 (E. D. Cal. Jan 14, 2010) (Karlton, J.).

1   contend that "the first opportunity [they] had to inquire into [Baumgardner's]

2   opinions was at his deposition on July 22[, 2010], at which he stated, on multiple

3   occasions that he formed no opinions tentative or otherwise, that he was prepared

4   to testify to at that time or planned to testify to in the future either in a sworn

5   declaration or in other sworn testimony." (Pls.' Mem. re Mot. to Strike at 2:2-7.)

6   Less than one month later, on August 17, 2010, Baumgardner executed a

7   declaration regarding emergency management planning in support of the City's

8   opposition to Plaintiffs' Motion for Summary Judgment.

9       Plaintiffs argue that the City cannot rely on late disclosed documents

10  referenced by Baumgardner in his declaration. (Pls.' Mem. re Mot. to Strike at

11  3:13-24.) The Court finds that the City's failure to disclose the Federal

12  Emergency Management Agency ("FEMA") Comprehensive Preparedness Guide

13  101 is harmless because it is a publicly available planning document. The Court,

14  however, strikes paragraph 14 because it refers to "procedural documents or

15  Standard Operating Procedures" that were not produced by the City.[8]

16      Plaintiffs also argue that Baumgardner's declaration should be stricken

17  because it contains late-disclosed expert opinions. (*Id.* at 5:12.) Although

18  Baumgardner was disclosed as an expert witness and it is disconcerting to the

19  Court that Baumgardner was so ill-prepared for his deposition, the Court finds that

20  the City may rely on Baumgardner as a fact witness due to his employment as the

21  Emergency Preparedness Coordinator I with the City's EMD assigned to the

22  Operations Division, Planning Unit as the Planning Officer. (*See* Baumgardner

23  Decl. at ¶ 1.) The statements made in Baumgardner's declaration are well within

24  the realm of permissible testimony given his professional experience. Moreover,

25  Plaintiffs had the opportunity to depose him and likely could have anticipated

26  most, if not all, of these issues. Therefore, the Court strikes only paragraph 14 of

27

28  [8] The City maintains that Baumgardner's declaration refers only to the FEMA Comprehensive Preparedness Guide 101. (The City's Opposition to Plaintiffs' Motion to Strike Declarations at 6:1-7.)

1   Baumgardner's declaration because it refers to "procedural documents or Standard

2   Operating Procedures" that were not produced by the City.

3   **b. The Court Strikes Only Paragraph 26 of the Declaration of**

4   **Angela Kaufman**

5   Angela Kaufman ("Kaufman") is the ADA Compliance Coordinator with

6   the DOD. (Declaration of Angela Kaufman, ADA Compliance Coordinator with

7   the DOD, ("Kaufman Decl.") at ¶ 2.) The City designated Kaufman as an expert

8   on July 6, 2010. (Gilbride Decl. at ¶ 5, Ex. C.) During her deposition on July 22,

9   2010, the City's counsel stated that Kaufman was being offered as a rebuttal

10  expert to Plaintiffs' designated expert witnesses. (*Id.* at ¶ 4, Ex. B at 94:10-95:2.)

11  Kaufman also testified that she was a rebuttal expert witness and that she intended

12  to offer testimony only on the issue of personal preparedness in the event of a

13  disaster and rebuttal testimony to the testimony of Plaintiffs' expert witnesses.

14  (*Id.* at ¶ 4, Ex. B at 94:17-95:2, 98:1-10.)

15  The Court finds that Kaufman possesses the necessary qualifications to

16  testify as an expert witness because she has significant work experience in the

17  field of emergency planning, and has served on several committees and advisory

18  boards involving disability and emergency planning and management. (Kaufman

19  Decl. at ¶¶ 4-18.) Because Kaufman was designated as an expert witness for the

20  purposes of opining on personal preparedness in the event of a disaster and

21  rebutting the testimony of Plaintiffs' designated experts, the Court does not

22  consider her opinions as to any other issues because the City has failed to

23  demonstrate substantial justification or harmlessness for the failure to disclose

24  such opinions. Due to her employment as the ADA Compliance Coordinator with

25  the DOD, Kaufman may also address the DOD's policies and practices and her

26  personal experiences in her capacity as the ADA Compliance Coordinator.

27  Accordingly, the Court strikes paragraph 26 of Kaufman's declaration.

28

### c.  The Court Strikes the Declaration of Ralph Acuna

Ralph Acuna ("Acuna") is a Management Analyst II for the DOD.
(Declaration of Ralph Acuna, Management Analyst II for the DOD, at ¶ 2.)
Although the City never disclosed Acuna as either a fact or expert witness, (Pls.'
Mem. re Mot. to Strike at 16:7-12), it argues that Acuna was known to Plaintiffs
as having relevant testimony and the City's failure to formally designate him as a
witness is harmless. (The City's Opposition to Plaintiff's Motion to Strike
Declarations ("Def.'s Opp'n to Mot. to Strike") at 3:18-20; 4:23-5:1.)

The record before the Court reflects that the City never disclosed Acuna as a
witness.  The Joint Rule 26(f) Report limited the number of declarations and
depositions available to each party; therefore, it is entirely reasonable to conclude
that Plaintiffs' discovery strategy was dictated by the disclosed witness lists.
Because the City has failed to meet its burden, the Court strikes Acuna's
declaration in its entirety.

### d.  The Court Strikes the Declaration of Timothy Ottman

On July 9, 2010, Plaintiffs served a deposition notice on the City seeking to
examine the person most knowledgeable about the "[p]olicies, procedures and/or
protocols of the Los Angeles Fire Department (LAFD) related to (1) notifying
people with disabilities; (2) providing evacuation assistance to people with
disabilities; and (3) providing transportation assistance to people with disabilities
in the event of a disaster." (Gilbride Decl. at ¶ 8, Ex. F.)  The City produced Stacy
Gerlich, who was deposed on July 12, 2010. (Pls.' Mem. re Mot. to Strike at 18:5-
6.)

In opposition to Plaintiffs' Motion for Summary Judgment, the City filed
the declaration of Timothy Ottman ("Ottman"), the Battalion Chief of the LAFD
and the LAFD's Safety Officer. (Declaration of Thomas A. Ottman, Battalion
Chief of the LAFD and the LAFD's Safety Officer, at ¶ 1.)  Ottman was not
disclosed as a witness and the City concedes that Plaintiffs had no actual notice of

1    this witness. (Def.'s Opp'n re Mot. to Strike at 9:5-7.) The City, however, argues

2    that its failure to disclose was substantially justified and harmless because the City

3    could not reach Gerlich and Ottman's declaration is consistent with her deposition

4    testimony. (Def.'s Opp'n re Mot. to Strike at 9:19-10:6; Dermer Decl. at ¶ 14.)

5        The City fails to demonstrate that the late disclosure is substantially justified

6    and it fails to explain why it did not use Gerlich as its declarant in support of the

7    opposition. Moreover, the Court does not need to rely on the allegedly disputed

8    fact, (SGI at ¶ 206), to rule on Plaintiffs' Motion for Summary Judgment.

9        The City likewise fails to establish that the late disclosure is harmless.

10   Plaintiffs are prejudiced by the City's reliance on an undisclosed witness,

11   particularly when they specifically requested that the City produce the person with

12   the most knowledge about the areas discussed in Ottman's declaration. Therefore,

13   the Court strikes Ottman's declaration in its entirety.

14        **e.  The Court Strikes the Declaration of Luann Pannell**

15        On July 9, 2010, Plaintiffs served a deposition notice on the City seeking to

16   examine the person most knowledgeable about the "[p]olicies, procedures and/or

17   protocols of the Los Angeles Police Department (LAPD) related to (1) notifying

18   people with disabilities; (2) providing evacuation assistance to people with

19   disabilities; and (3) providing transportation assistance to people with disabilities

20   in the event of a disaster." (Gilbride Decl. at ¶ 8, Ex. F.) The City produced

21   Andrew Neiman ("Neiman"), who was deposed on July 12, 2010. (Pls.' Mem. re

22   Mot. to Strike at 19:19-20.)

23        In opposition to Plaintiffs' Motion for Summary Judgment, the City filed

24   the declaration of Luann Pannell ("Pannell"), the Director of Police Training and

25   Education for the LAPD. (Declaration of Luann P. Pannell, Director of Police

26   Training and Education for the LAPD, at ¶ 2.) The City contends that its failure to

27   disclose was substantially justified and harmless because the City could not reach

28

1   Neiman and Pannell's declaration is consistent with his deposition testimony.

2   (Def.'s Opp'n re Mot. to Strike at 9:16-10:6; Dermer Decl. at ¶ 14.)

3          The City again fails to demonstrate that the late disclosure is either

4   substantially justified or harmless.  The City fails to explain what attempts it made

5   to contact Neiman.  It similarly fails to establish that its reliance on an undisclosed

6   witness was harmless to Plaintiffs.  Regardless, the Court does not need to rely on

7   the allegedly disputed fact, (SGI at ¶ 208), to rule on Plaintiffs' Motion for

8   Summary Judgment.  Accordingly, the Court strikes Pannell's declaration in its

9   entirety.

10         The Court notes that the City strenuously objects to the exclusion of these

11  declarations because they comprise a substantial portion of its evidence in

12  opposition to Plaintiffs' Motion for Summary Judgment.  (Def.'s Opp'n to Mot. to

13  Strike at 2:3-3:17.)  Yet the City could have submitted other evidence – such as

14  deposition testimony or declarations from disclosed witnesses – produced in

15  accordance with the discovery rules rather than rely so heavily on declarations

16  involving late-disclosed information or witnesses.  The Court will not permit the

17  City to circumvent discovery rules where it could have easily complied with such

18  rules and where it has failed to establish that the late disclosures were either

19  substantially justified or harmless.  Thus, the Court strikes the declarations of

20  Baumgardner and Kaufman to the extent set forth above and the declarations of

21  Acuna, Ottman, and Pannell in their entirety.

22  **OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF AND IN**

23  **OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

24         In addition to Plaintiffs' Motion to Strike, both parties separately filed

25  objections to evidence submitted by the opposing party in support of or in

26  opposition to the Motion for Summary Judgment.

27  **I.  THE CITY'S OBJECTIONS**

28         The Court summarily overrules all of the City's 419 objections to evidence

1    submitted by Plaintiffs in support of their Motion for Summary Judgment as

2    unduly vague and overbroad.  The City's objections concern the following

3    evidence: (1) the deposition testimony of Anna Burton (Objection Nos. 1-57); (2)

4    the deposition testimony of Steve Dargan (Objection Nos. 58-73); the deposition

5    testimony of James Featherstone (Objection Nos. 74-127); (4) the deposition

6    testimony of Robert Freeman (Objection Nos. 128-58); (5) the deposition

7    testimony of Keith Garcia (Objection Nos. 159-217); (6) the deposition testimony

8    of Stacy Gerlich (Objection Nos. 218-53); (7) the deposition testimony of Angela

9    Kaufman (Objection Nos. 254-78); (8) the deposition testimony of Michael

10   Kleiner (Objection Nos. 279-92); (9) the deposition testimony of Andrew Neiman

11   (Objection Nos. 293-327); (10) the deposition testimony of Albert Torres

12   (Objection Nos. 328-57); (11) the declaration of Michael Collins (Objection Nos.

13   358-77); (12) the declaration of Harthorn (Objection Nos. 378-82); (13) the

14   declaration of June Kailes (Objection Nos. 383-403); (14) the declaration of

15   Shannon Murray (Objection Nos. 404-08); (15) the declaration of Lilibeth

16   Navarro (Objection Nos. 409-16); and (16) the declaration of Norma Jean

17   Vescovo (Objection Nos. 417-19).  [Doc. No. 97-12.]

18        In *Dukes v. Wal-Mart, Inc.*, the defendant raised "hundreds, if not

19   thousands, of [evidentiary] objections" to the 114 declarations filed by the

20   plaintiffs.  222 F.R.D. 189, 198 (N.D. Cal. 2004) (Jenkins, J.).  The district court

21   concluded that the objections were unduly vague because the defendant failed to

22   provide any individualized discussion of the objections.  *Id.* at 199.  The district

23   court further observed that the defendant's "grossly overbroad approach is more

24   suggestive of an intent to harass than a good faith effort to address genuine

25   objections."  *Id.* at 199.

26        Similarly, in *Californians for Disability Rights, Inc. v. California*

27   *Department of Transportation*, the defendants submitted 121 boilerplate,

28   evidentiary objections to various declarations offered by the plaintiffs in support

1  of their motion.  249 F.R.D. 334, 349-50 (N.D. Cal. 2008) (Armstrong, J.).  The

2  Court therefore "decline[d] the defendants' invitation to analyze objections that

3  defendants did not themselves bother to analyze, and the objections [were]

4  overruled on those grounds alone."  *Id.* at 350.

5        It is not the Court's responsibility to attempt to discern the City's grounds

6  for objecting to evidence submitted by Plaintiffs where the City merely repeats the

7  same categorical objections but provides little to no explanation as to why the

8  subject evidence is objectionable.  Accordingly, the Court summarily overrules all

9  of the City's objections.

10  **II.  PLAINTIFFS' OBJECTION**

11        The Court sustains Plaintiffs' objection to the City's filing of the

12  unaccompanied Declaration of Angela M. Kaufman in Reply to June Kailes'

13  Reply Declaration filed on September 21, 2010.  [Doc. No. 106.]  Although not

14  styled as a response to a reply, the City should have sought leave from the Court

15  prior to filing Kaufman's reply declaration.  L.R. 7-10 ("Absent prior written

16  order of the Court, the opposing party shall not file a response to the reply.").

17  However, the Court also strikes paragraph 7 of June Kailes' reply declaration

18  because it addresses facts related to the FEMA's Comprehensive Preparedness

19  Guide 301 which were not previously addressed in the City's opposition to

20  Plaintiffs' Motion for Summary Judgment.

21       **PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE**

22        Plaintiffs request that the Court take judicial notice of the following

23  documents in support of their Motion for Summary Judgment: (1) website of the

24  City's EMD page entitled "Caring for those who depend on you – Persons with

25  Disabilities"; (2) Los Angeles QuickFacts from the U.S. Census Bureau; (3)

26  website of the City's EMD page entitled "Emergency Plans and Annexes"; (4)

27  website of the City's EMD page entitled "Emergency Management Committee";

28  (5) Excerpts of the City's Citywide Logistics Annex; (6) The City's Tsunami San

1   Pedro Area Evacuation Maps; and (7) excerpts from the City's Recovery and

2   Reconstruction Plan. (Plaintiffs' Request for Judicial Notice in Support of

3   Plaintiffs' Motion for Summary Judgment at 1:1-2:26.)

4        Federal Rule of Evidence 201 provides that "[a] judicially noticed fact must

5   be one not subject to reasonable dispute in that it is either (1) generally known

6   within the territorial jurisdiction of the trial court or (2) capable of accurate and

7   ready determination by resort to sources whose accuracy cannot reasonably be

8   questioned." FED. R. EVID. 201(b). Generally, courts take judicial notice of

9   governmental websites provided that they have sufficient indicia of reliability.

10  *See, e.g. Lemperle v. Wash. Mut. Bank*, 2010 U.S. Dist. LEXIS 107204, *7-8 (S.D.

11  Cal. Oct. 7, 2010) (Anello, J.); *see also Woods v. Greenpoint Mortg. Funding,*

12  *Inc.*, 2010 U.S. Dist. LEXIS 76804, *5-6 (E.D. Cal. July 28, 2010) (Shubb, J.); *see*

13  *also Jarvis v. JP Morgan Chase Bank, N.A.*, 2010 U.S. Dist. LEXIS 84958, *3-4

14  (C.D. Cal. July 23, 2010) (King, J.). All of the above-referenced documents are

15  public materials available on governmental websites. Therefore, the Court takes

16  judicial notice of these documents.

17  **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

18  **I. LEGAL STANDARD**

19       On a motion for summary judgment, the Court must determine whether,

20  viewing the evidence in the light most favorable to the nonmoving party, there are

21  any genuine issues of material fact. FED. R. CIV. P. 56(c); *see also Simo v. Union*

22  *of Needletrades*, 322 F.3d 602, 609-10 (9th Cir. 2003). Summary judgment

23  against a party is appropriate when the depositions, answers to interrogatories, and

24  admissions on file, together with the affidavits or declarations, if any, show that

25  there is no genuine issue as to any material fact and that the moving party is

26  entitled to judgment as a matter of law. FED. R. CIV. P. 56(a), (c). The moving

27  party bears the initial burden of establishing the basis for its motion and

28  identifying those portions of the pleadings and discovery responses that

1  demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v.*
2  *Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its initial burden, the
3  nonmoving party must then set forth, by affidavit or as otherwise provided in Rule
4  56, specific facts showing that there is a genuine issue for trial. *Anderson v.*
5  *Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

6  In judging evidence at the summary judgment stage, the Court does not
7  make credibility determinations or weigh conflicting evidence. *T.W. Elec. Serv.,*
8  *Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Rather,
9  "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences
10  are to be drawn in [the nonmovant's] favor." *Anderson*, 477 U.S. at 255. The
11  evidence presented by the parties must be admissible. FED. R. CIV. P. 56(c).
12  Conclusory, speculative testimony is insufficient to raise genuine issues of
13  material fact and defeat summary judgment. *Soremekun v. Thrifty Payless, Inc.*,
14  509 F.3d 978, 984 (9th Cir. 2007).

15  **II. DISCUSSION**

16  Plaintiffs request that the Court enter summary judgment on each of their
17  causes of action with respect to liability because, despite the special
18  accommodations that individuals with disabilities require, the City admits that it
19  has no plan to notify, evacuate, transport, or shelter these individuals in the event
20  of an emergency or natural disaster. (Pls.' Mem. re Mot. for Summary Judgment
21  at 1:6-2:24.) Plaintiffs argue that the City's residents with disabilities are
22  consequently at a higher risk than the general population to be harmed in an
23  emergency or natural disaster. (*Id.*) The named plaintiffs also maintain that they
24  have experienced immediate fear, apprehension, and unease because they believe
25  they have a right to be, but are not, included in the City's emergency preparedness
26  program. (*Id.*; Declaration of Audrey Harthorn, Plaintiff, ("Harthorn Decl.") at ¶
27  11; Declaration of Lilibeth Navarro, founder and Executive Director of CALIF,
28  ("Navarro Decl.") at ¶¶ 10, 12.)

1    The City, meanwhile, contends that Plaintiffs are not entitled to judgment as

2    a matter of law because "there is no evidence presented by Plaintiffs as to what

3    service the City actually provides (not ideally should provide) for its residents

4    generally that it does not provide for [Plaintiffs]." (The City's Memorandum of

5    Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment

6    ("Defs.' Opp'n to Mot. for Summary Judgment") at 4:22-24.) According to the

7    City, Plaintiffs cannot establish actual discrimination because "the City has not

8    taken *any* action which disproportionately burdens people with disabilities." (*Id.*

9    at 4:8-9.) (emphasis in original) Thus, the City argues that they cannot be held

10   liable for any alleged violations because they have not "*exclude[d]* people with

11   disabilities by reason of those disabilities" from any public program or service.

12   (*Id.* at 4:19-21.) (emphasis in original) Finally, the City argues that Plaintiffs

13   cannot prevail on a motion for summary judgment because they have presented no

14   evidence that the class representatives requested, but were refused, a reasonable

15   accommodation from the City. (*Id.* at 4:24-26.)

16         **a. Plaintiffs are Entitled to Judgment as a Matter of Law as to**

17            **Liability on their ADA and Section 504 Claims Against the City**

18   Congress enacted the ADA "to remedy widespread discrimination against

19   disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). Title

20   II of the ADA, in particular, prohibits discrimination against individuals with

21   disabilities in the provision of services, programs, or activities by public entities.

22   42 U.S.C. § 12132. Section 504, in turn, requires that "[n]o otherwise qualified

23   individual with a disability in the United States . . . shall, solely by reason of her

24   or his disability, be excluded from the participation in, be denied the benefits of,

25   or be subjected to discrimination under any program or activity receiving Federal

26   financial assistance." 29 U.S.C. § 794(a). Due to the similarities between the

27   statutes, the Ninth Circuit has held that "there is no significant difference in the

28   analysis of rights and obligations created by" the ADA and Section 504. *Vinson v.*

1   *Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002); *see also Pierce v. County of*

2   *Orange*, 519 F.3d 985, 1010 n.27 (9th Cir. 2008) ("Title II of the ADA was

3   expressly modeled after § 504 . . . and essentially extends coverage to state and

4   local government entities that do not receive federal funds.").

5          To establish a violation of Title II of the ADA, "a plaintiff must show: [(i)]

6   he is a 'qualified individual with a disability'; [(ii)] he was either excluded from

7   participation in or denied the benefits of a public entity's services, programs or

8   activities, or was otherwise discriminated against by the public entity; and [(iii)]

9   *such exclusion, denial of benefits, or discrimination was by reason of his*

10  *disability.*" *Weinreich v. Los Angeles County Metro. Trans. Auth.*, 114 F.3d 976,

11  978 (9th Cir. 1997) (emphasis in original); *see also* 42 U.S.C. § 12132.  To

12  establish a Section 504 violation, a plaintiff must also show that the program

13  receives federal funding.  29 U.S.C. § 794(a).

14         The plaintiff bears the initial burden of establishing a prima facie case,

15  including that a reasonable accommodation is available. *Pierce*, 519 F.3d at 1011.

16  The public entity may rebut the plaintiff's showing by demonstrating that the

17  requested accommodation would require a fundamental alteration or cause an

18  undue burden. *Id*.

19            *i.  The Named Plaintiffs and Class Members are Qualified*

20                 *Individuals with Disabilities*

21         Pursuant to the ADA, "[t]he term 'disability' means, with respect to an

22  individual[,] (A) a physical or mental impairment that substantially limits one or

23  more of the major life activities of such individual; (B) a record of such an

24  impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §

25  12102(1); *see also* 28 C.F.R. § 35.104.

26         Plaintiffs have established that they are, or advocate on behalf of, qualified

27  individuals with disabilities.  Harthorn is a resident of Los Angeles who suffers

28  from arthrogryposis, a congenital condition causing multiple joint contractures and

1    lack of muscle development. (Harthorn Decl. at ¶ 2.) She uses a power

2    wheelchair for mobility but cannot get into or out of her chair independently. (*Id.*)

3    CALIF, meanwhile, is a private, non-profit community-based corporation

4    providing advocacy, resources, and individualized assistance to people with

5    disabilities in the Los Angeles area. (Navarro Decl. at ¶ 3.) It is devoted to the

6    goal of full inclusion, equality, and civil rights for all people with disabilities,

7    especially in the underserved minority communities of Los Angeles. (*Id.*) The

8    Court also notes that the City stipulated that the named plaintiffs be designated as

9    the class representatives for purposes of this action. [Doc. No. 81.]

10        Plaintiffs have also established that the class consists of individuals with

11   disabilities. Indeed, the parties stipulated that the class is comprised of all people

12   with disabilities, as defined by the ADA, who are within the City and the

13   jurisdiction served by the City's and the County's emergency preparedness

14   programs and services. (Order Approving Certification of a Class at 1:4-9.)

15   Accordingly, the Court finds that Plaintiffs and all class members are qualified

16   individuals with disabilities.

17              *ii.  Plaintiffs are Excluded from Participation in the City's*

18                      *Emergency Preparedness Program*

19        The ADA is a comprehensive mandate designed to eliminate both "outright

20   intentional exclusion" and "the discriminatory effects of architectural,

21   transportation, and communication barriers, overprotective rules and policies,

22   [and] failure to make modifications to existing facilities and practices." 42 U.S.C.

23   § 12101(a)(5). It applies with equal force to facially neutral policies that

24   discriminate against individuals with disabilities. *See McGary v. City of Portland*,

25   386 F.3d 1259, 1265 (9th Cir. 2004) (explaining that the Ninth Circuit has

26   "repeatedly recognized that facially neutral policies may violate the ADA when

27   such policies unduly burden disabled persons, even when such policies are

28   consistent enforced."); *see also Crowder v. Kitagawa*, 81 F.3d 1480, 1483-84 (9th

1    Cir. 1996).  With respect to facially neutral policies, courts must determine

2    whether individuals with disabilities are denied "meaningful access" to state-

3    provided programs, services, and activities.  *Crowder*, 81 F.3d at 1484.  If

4    qualified individuals are denied "meaningful access" to a benefit because of their

5    disability, the public entity must provide reasonable modifications.[9]  *Mark H.*

6    *Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008).  The accompanying regulation

7    provides that a "[b]enefit includes provision of services, financial aid or

8    disposition (i.e. treatment, handling, decision, sentencing confinement, or other

9    prescription of conduct)."  28 C.F.R. § 42.540(j).

10        In *Crowder v. Kitagawa*, the Ninth Circuit held that a facially neutral and

11   uniformly enforced Hawaii law requiring an 120-day quarantine on carnivorous

12   animals entering the state violated the ADA because it "burden[ed] visually-

13   impaired persons in a manner different and greater than it burden[ed] others."  81

14   F.3d at 1484.  The Court explained that, "[b]ecause of the unique dependence

15   upon guide dogs among many of the visually-impaired, Hawaii's quarantine

16   effectively denie[d] these persons . . . meaningful access to state services,

17   programs, and activities while such services programs, and activities remain[ed]

18   open and easily accessible by others."  *Id.*

19        Relying on *Crowder*, the Ninth Circuit upheld a preliminary injunction

20   precluding Los Angeles County from closing a hospital dedicated primarily to

21   providing rehabilitative services to individuals with disabilities.  *Rodde v. Bonta*,

22   357 F.3d 988 (9th Cir. 2004).  Because no other facility in the County could

23   provide comparable services, the Court held that "the closure of [the facility]

24   would deny certain disabled individuals meaningful access to government-

25   provided services because of their unique needs, while others would retain access

26   to the same class of services."  *Id.* at 998.

27

28   _____
     [9] "Reasonable accommodation" and "reasonable modification" are interchangeable terms.  *McGary*, 386 F.3d at
     1266 n.3.

1       In this case, the City provides a governmental program – its emergency

2   preparedness program – to its residents.  According to the Chief of the Operations

3   Division of the City's EMD, the emergency preparedness program is "designed to

4   save lives, protect property and return the City to normal service levels" by

5   "assist[ing] in the response and recovery efforts following a disaster."  (Freeman

6   Decl. at ¶¶ 4, 5.)  To this end, the City provides a variety of "benefits," including,

7   but not limited to, the provision of services to notify, evacuate, transport, and

8   shelter its residents in the event of an emergency or disaster.

9       The City's emergency preparedness program is designed to apply equally to

10  all of its residents.  (*Id.* at ¶ 12.)  Plaintiffs, however, have provided substantial

11  evidence demonstrating that individuals with disabilities lack meaningful access to

12  the City's emergency preparedness program due to the City's failure to address or

13  provide for their unique needs.  Although it is not necessary for the Court to

14  enumerate every deficiency at this stage in the litigation, Plaintiffs have

15  established, and the City has failed to dispute, that the City's emergency

16  preparedness program does not include provisions to notify people with auditory

17  impairments or cognitive disabilities of an emergency, or evacuate, transport, or

18  temporarily house individuals with disabilities during or immediately following an

19  emergency or disaster despite the fact that such individuals have special needs and

20  may require reasonable accommodations during an emergency or disaster.

21  (Burton Dep. at 41:9-42:1, 44:5-8, 44:16-45:4, 52:18-22, 54:11-15, 127:5-13;

22  Garcia Dep. at 36:1-4, 36:23-37:13, 41:8-12[10], 55:8-56:1, 42:15-19, 55:8-56:1;

23  Freeman Dep. at 27:7-28:2, 56:21-25, 57:3-7, 78:8-12; Featherstone Dep. at

24  59:22-60:15, 67:21-25, 68:16-71:10; Kaufman Dep. at 129:12-19, 131:19-22,

25  132:2-6; Gerlich Dep. at 50:1-5.)

26

27  _____

28  [10] The Court notes that the City can request buses that are accessible for people with disabilities.  (Garcia Dep. at
37:3-9.)

1       The City contends that the emergency preparedness program is intended to

2   be general – not tactical – in nature, and actual responsibilities are to be delegated

3   to other departments. (Freeman Dep. at 15:14-23, 28:18-29:4, Featherstone Dep.

4   at 67:17-22.) Yet there is no evidence in the record that the individual

5   departments which have been delegated the responsibility of assisting such

6   individuals, including the LAFD, the LAPD, and the Department of Parks and

7   Recreation, have any plans for addressing the needs of individuals with disabilities

8   in the event of an emergency or disaster. (Freeman Dep. at 72:11-14; Neiman

9   Dep. at 32:12-16, 54:23-55:17, 59:18-60:16; Gerlich Dep. at 23:15-22, 38:11-20,

10  39:9-18.) Neither the City nor the individual departments have assessed whether

11  they have the capacity to respond to the needs of individuals with disabilities

12  during an emergency or disaster. (Neiman Dep. at 31:22-32:3, 43:12-16; Gerlich

13  Dep. at 34:15-20, 35:13-18, 47:20-24; Kaufman Dep. at 167:6-13, 188:24-189:4.)

14  The City also has failed to provide any evidence of the provision of reasonable

15  accommodations to specific disabled individuals by any of its departments during

16  an emergency or disaster.

17      The DOD recognized that the City's emergency preparedness program "is

18  seriously out of compliance" with the ADA and Section 504 and the City's

19  residents with disabilities "will continue to be at-risk for suffering and death in

20  disproportionate numbers unless the City drastically enhances the existing

21  disability-related emergency management and disaster planning process and

22  readiness as required by the ADA and other statutes." (Smith Decl. at ¶ 14, Ex.

23  L.) The Court therefore concludes that individuals with disabilities are

24  disproportionately burdened by the City's failure to consider their unique needs in

25  the administration of its emergency preparedness program.

26      The City's provision of shelters provides one of many examples in which

27  individuals with disabilities lack meaningful access to the City's emergency

28  preparedness program. The City, through its Department of Parks and Recreation,

1   has a plan for providing mass shelter and care for residents who are forced to

2   evacuate their homes and it has identified approximately 200 shelter sites to be

3   used in the event of an emergency or disaster. (Torres Dep. at 16:13-19; 47:12-

4   18.) However, the City does not know which, if any, of these shelters are

5   architecturally accessible to individuals with disabilities. (*Id*. at 21:15-21.)

6   Likewise, the City does not know which, if any, of these shelter sites could

7   accommodate people with specific special needs, such as service animals. (*Id*. at

8   35:24-36:6, 38:7-12, 42:2-5.) Individuals with disabilities currently have no way

9   of knowing which shelters have been designated as accessible. (Burton Dep. at

10  66:4-8.) In the event of an emergency or disaster, individuals with disabilities are

11  therefore disproportionately burdened by the City's failure to provide or identify

12  accessible shelters when such shelters are available to other residents. While the

13  Court commends the City for continuing to conduct full accessibility surveys of its

14  shelters and for identifying the need for evacuation devices, such as portable lifts

15  and evacuation chairs, (*id*. at 19:13-17, 20:7-22; Kaufman Decl. at ¶ 25), such

16  efforts – in isolation – are not sufficient.

17       The City's response that its lack of affirmative action with respect to

18  individuals with disabilities somehow absolves the City of liability is not only

19  unavailing but also contrary to clearly-established precedent. *See McGary*, 386

20  F.3d at 1266 (explaining that the ADA "guard[s] against the façade of 'equal

21  treatment' when particular accommodations are necessary to level the playing

22  field."). Because individuals with disabilities require special needs, the City

23  disproportionately burdens them through its facially neutral practice of

24  administering its program in a manner that fails to address such needs. (*See* Defs.'

25  Opp'n to Mot. for Summary Judgment at 8:11-13.)

26       The City's contentions that it can make *ad hoc* reasonable accommodations

27  upon request or that Plaintiffs' claims are somehow deficient because the named

28  plaintiffs have not sought individual accommodations are both legally inadequate

1   and practically unrealistic.  The gravamen of Plaintiffs' complaint is that the City

2   fails to provide for the unique needs of individuals with disabilities in its

3   emergency preparedness program.  The purpose of the City's emergency

4   preparedness program is to *anticipate* the needs of its residents in the event of an

5   emergency and to *minimize* the very type of last-minute, individualized requests

6   for assistance described by the City, particularly when the City's infrastructure

7   may be substantially compromised or strained by an imminent or ongoing

8   emergency or disaster.

9        The Court is similarly not persuaded by the City's argument concerning the

10  importance of personal planning and preparedness.  (Defs.' Opp'n to Mot. for

11  Summary Judgment at 1:11-13.)  Although it is certainly important for all of the

12  City's residents to prepare for an emergency, it is the City's emergency

13  preparedness program that is at issue in this action.  The City provides a

14  comprehensive emergency preparedness program and such program must be open

15  and accessible to all of its residents.  It is irrelevant for purposes of this action

16  whether individuals should also personally plan and prepare for emergencies

17  and/or disasters.  Accordingly, the Court finds that Plaintiffs are denied the

18  benefits of the City's emergency preparedness program because the City's practice

19  of failing to address the needs of individuals with disabilities discriminates against

20  such individuals by denying them meaningful access to the City's emergency

21  preparedness program.

22            ***iii.   The Exclusion of Plaintiffs from the City's Emergency***

23            ***Preparedness Program is by Reason of Their Disabilities***

24        To be actionable, the exclusion from participation in or denial of the

25  benefits of services, programs or activities by a public entity must be by reason of

26  a disability.  *See* 42 U.S.C. § 12132.  In *McGary*, the City of Portland's Office of

27  Planning and Development Review ("OPDR") issued a Notice to Remove

28  Nuisance because it concluded that the amount of trash and debris in the plaintiff's

1  yard constituted a nuisance in violation of the city code. 386 F.3d at 1260. The

2  plaintiff, an individual with AIDS, was subsequently hospitalized with meningitis,

3  but the OPDR refused to provide the plaintiff with additional time to remove the

4  debris. *Id*. at 1260-61. Although it did not reach the merits, the Ninth Circuit held

5  that the plaintiff sufficiently alleged that he was discriminated against by reason of

6  his disability due to the City's failure to provide a reasonable time

7  accommodation. *Id*. at 1269-70.

8       Here, too, the denial of meaningful access to the City's emergency

9  preparedness program is by reason of Plaintiffs' disabilities. The City provides a

10 comprehensive emergency preparedness program to the general public but it

11 denies individuals with disabilities meaningful access to the program while the

12 benefits of the program remain open and easily accessible to other residents.

13 Because of the City's failure to address their unique needs, individuals with

14 disabilities are disproportionately vulnerable to harm in the event of an emergency

15 or disaster.

16      The City's reliance on *Weinreich v. Los Angeles County Metro. Transp.*

17 *Auth.*, 114 F.3d 976 (9th Cir. 1997), is inapposite. In *Weinreich*, the Ninth Circuit

18 held that Los Angeles County's Metropolitan Transportation Authority ("MTA")

19 did not discriminate against the plaintiff on the basis of his disability by refusing

20 to exempt him from a recertification requirement of the MTA's Reduced Fare

21 Program. 114 F.3d at 978. The Reduced Fare Program served elderly and eligible

22 disabled patrons but, to qualify, disabled participants must provide updated

23 medical information every three years demonstrating the ongoing existence of a

24 disability. *Id*. The plaintiff sought an exemption from the recertification

25 requirement because he was indigent and could not afford to pay a private doctor

26 to recertify his disability. *Id*. The Ninth Circuit held that the plaintiff's "lack of

27 'meaningful access' to the Reduced Fare Program was not due to his medical

28 disability, but rather to his inability to satisfy a condition of eligibility because of

1    his financial circumstances." *Id*. at 979.

2          Unlike *Weinreich*, the City's failure to address the unique needs of

3    individuals with disabilities in its emergency preparedness program is by reason of

4    their disabilities. The City contends that the emergency preparedness program is

5    intended to be general, not tactical, in nature, and actual responsibilities are to be

6    delegated to other departments. (Freeman Dep. at 15:14-23, 28:18-29:4,

7    Featherstone Dep. at 67:17-22.) Because of this practice, individuals with

8    disabilities are burdened "in a manner different and greater than it burdens

9    others." *Crowder*, 81 F.3d at 1484. For example, although the City has a plan to

10   provide shelter at designated sites, the record reflects that many, if not all, of these

11   sites are not ADA-compliant. (Torres Dep. at 21:15-21.) Because the City does

12   not know which of its shelters are accessible, individuals with disabilities do not

13   know how to locate an accessible shelter. Accordingly, the Court finds that

14   Plaintiffs' exclusion from the City's emergency preparedness program is by

15   reason of their disabilities.

16                           *iv.  The City Receives Federal Funding*

17         To assert a Section 504 claim, a plaintiff must establish that the program at

18   issue receives federal funding. 29 U.S.C § 794(a). It is undisputed that the City

19   receives federal funding for its emergency preparedness program. (SGI at ¶ 243.)

20   Plaintiffs have therefore established this element of their Section 504 claim.

21                           *v.  Reasonable Modifications are Available*

22         "When a state's policies, practices or procedures discriminate against the

23   disabled in violation of the ADA, Department of Justice regulations require

24   reasonable modifications in such policies, practices or procedures 'when the

25   modifications are necessary to avoid discrimination on the basis of disability,

26   unless the public entity can demonstrate that making the modifications would

27   fundamentally alter the nature of the service, program, or activity.'" *Crowder*, 81

28   F.3d at 1485 (quoting 28 C.F.R. § 35.130(b)(7)).

1    Plaintiffs have established that reasonable modification(s) to the City's

2    emergency preparedness program are available, including those identified in the

3    DOD's recommendations to the EMD and the U.S. Department of Justice's ADA

4    Checklist for Emergency Shelters.  (Smith Decl. at ¶ 14, Ex. L; Collins Decl. ¶¶

5    15, 30, Ex. A; Declaration of June Kailes, Plaintiffs' Expert, at ¶¶ 18, 21, 39, 48.)

6    Although the City disputes whether some of the reasonable modifications

7    enumerated by Plaintiffs are necessary or purely "aspirational," it has presented no

8    evidence demonstrating that any specific reasonable modification would

9    fundamentally alter the nature of its emergency preparedness program or cause

10   undue burden.  Plaintiffs, however, seek an entry of summary judgment solely on

11   the issue of liability, and the Court consequently makes no finding as to the

12   appropriate remedy at this stage of the litigation.

13           **b.  Plaintiffs are Entitled to Judgment as a Matter of Law as to**

14                **Liability on Their State Law Claims Against the City**

15               *vi.   The City Violates the CDPA by Failing to Provide Full and*

16                     *Equal Access to the City's Emergency Preparedness Program*

17           The CDPA provides that "[i]ndividuals with disabilities shall be entitled to

18   full and equal access, as other members of the general public, to accommodations,

19   advantages, [and] facilities."  CAL. CIV. CODE. § 54.1.  A violation of the ADA

20   also constitutes a violation of the CDPA.  CAL. CIV. CODE. § 54(c); *see also*

21   *Hubbard v. SoBreck*, 554 F.3d 742, 745 (9th Cir. 2009).  Accordingly, Plaintiffs

22   are entitled to judgment as a matter of law as to liability on their CDPA claim

23   because, as set forth above, they have established a violation of the ADA.

24               *vii.  The City Violates California Government Code Section 11135*

25                     *by Failing to Provide Full and Equal Access to the City's*

26                     *Emergency Preparedness Program*

27           Section 11135 prohibits any program or activity receiving financial

28   assistance from the state from denying "full and equal" access to or discriminating

1   against individuals with disabilities. CAL. GOV. CODE. § 11135. This section "is

2   identical to the Rehabilitation Act except that the entity must receive State

3   financial assistance rather than Federal financial assistance." *D.K. v. Solano*

4   *County Office of Educ.*, 667 F. Supp. 2d 1184, 1190-91 (E.D. Cal. 2009) (England,

5   J.). It is undisputed that the City receives state funding for its emergency

6   preparedness program. (SGI at ¶ 244.) The Court therefore finds that Plaintiffs

7   are entitled to judgment as a matter of law as to liability on their Section 11135

8   claim because, as set forth above, they have established a violation of Section 504

9   and the City receives state funding.

10                              **CONCLUSION**

11      Based on the foregoing, the Court hereby orders as follows:

12   1.   The Court **GRANTS** in part Plaintiffs' Motion to Strike as set forth

13        above;

14   2.   The Court **SUSTAINS** Plaintiffs' Objection;

15   3.   The Court **OVERRULES** Defendants' Objections;

16   4.   The Court **GRANTS** Plaintiffs' Request for Judicial Notice;

17   5.   The Court **GRANTS** Plaintiffs' Motion for Summary Adjudication as

18        to the City's liability on Plaintiffs' claims for: (1) violation of Title II of

19        ADA; (2) violation of Section 504; (3) violation of the CDPA,

20        California Civil Code § 54, *et seq.*; and (4) violation of California

21        Government Code § 11153;

22   6.   The Court finds that the City violated (1) Title II of ADA; (2) Section

23        504; (3) the CDPA, California Civil Code § 54, *et seq.*; and (4)

24        California Government Code § 11153, and Plaintiffs are entitled to

25        judgment as a matter of law as to liability on all of these claims;

26   7.   The pretrial conference date and trial date, presently scheduled for

27        March 28, 2011 and April 12, 2011, respectively, are hereby vacated;

28   8.   Plaintiffs and the City shall participate in a settlement conference with

1   Magistrate Judge Andrew J. Wistrich, to take place within twenty-one

2   (21) days of the date of this Order.  The parties shall meet and confer at

3   least once prior to the settlement conference with Judge Wistrich to

4   attempt to fashion a proposal to the Court for injunctive relief.  Such

5   relief shall apply to all components of the City's emergency

6   preparedness program and shall include a proposal for monitoring and a

7   schedule for implementation.  Within ten (10) days of the completion of

8   the settlement conference with Judge Wistrich, the parties shall file a

9   joint status report with the Court and, if necessary, the Court shall

10  thereafter schedule a status conference and set new pretrial and trial

11  dates; and

12  9.  All parties who have authority to settle and lead trial counsel for

13      Plaintiffs and the City shall attend both the meet-and-confer session and

14      the settlement conference with Judge Wistrich in person.

17  DATED:  February 10, 2011        By _____
18                                      CONSUELO B. MARSHALL
                                        UNITED STATES DISTRICT JUDGE